**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

_____

| | |
|---|---|
| BUNTING GRAPHICS, INC. | ) |
| d/b/a BUNTING ARCHITECTURAL | ) |
| METALS | ) |
| 20 River Road | ) |
| Verona, Pennsylvania 15147 | ) |
| | ) |
| Plaintiff, | ) |
| v. | )    **Civil Action No.:  1:19-cv-2323** |
| | ) |
| THE WHITING-TURNER | ) |
| CONTRACTING COMPANY | ) |
| 300 East Joppa Road | ) |
| Baltimore, Maryland 21286 | ) |
| | ) |
| SERVE: | ) |
| | ) |
| Timothy J. Regan, Resident Agent | ) |
| 300 East Joppa Road | ) |
| Baltimore, MD 21286 | ) |
| | ) |
| Defendant. | ) |

_____)

## COMPLAINT

Bunting Graphics, Inc. d/b/a Bunting Architectural Metals ("BAM"), by and through its

undersigned counsel, hereby files its Complaint against The Whiting-Turner Contracting

Company ("W-T"), and in support thereof states as follows:

## PARTIES

1.    BAM is a corporation organized under the laws of the Commonwealth of

Pennsylvania with its principal place of business located at 20 River Road, Verona, Pennsylvania

15147.

2.    Upon information and belief, W-T is a corporation organized under the laws of the State of Maryland and its principal place of business is located at 300 East Joppa Road, Baltimore, Maryland 21286.

## JURISDICTION AND VENUE

3.    This Court has subject matter jurisdiction over the claims against W-T in this matter pursuant to 28 U.S.C. § 1332 as BAM and W-T are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.    This Court also has personal jurisdiction over W-T because (a) it is a resident of the State of Maryland; and (b) it maintains its principal office in the State of Maryland.

5.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 for the same reasons set forth in the paragraph above.

## BACKGROUND

6.    W-T entered into a construction contract with PL Pentagon, LLC (the "Owner") to construct a high-rise, mixed-use building that is known as Pentagon Centre Building A and is located at 710 12th Street South, Arlington, Virginia 22202 (the "Project").

7.    The Project is located at the intersection of 12th Street South and South Hayes Street in Arlington, Virginia, immediately adjacent to a commuter rail station. The Project is a 25-story building with one level of below-grade parking, ground-floor retail and lobby, six (6) above-grade parking levels (approximately 396 spaces), and 18 residential levels containing 440 units. The ground-floor retail fronts both streets, and includes a mall entrance along South Hayes Street to the Pentagon City Centre mall. The residential lobby entrance is along 12th Street South, as are the parking and loading dock entries. The 8th floor and roof level contain

residential amenities, including courtyards, a pool and deck area, fitness room, club room and gallery.

The Subcontract and the Project Schedule

8.      In June 2017, BAM and W-T entered into a subcontract in the amount of $2,652,500 for BAM to furnish labor, material and necessary equipment and tools to perform three (3) primary scopes of work in connection with constructing the Project: (1) thermoplastic core panels, (2) perforated metal screens, and (3) architectural louvers.  A copy of the Subcontract is attached hereto as Exhibit 1 and incorporated herein.

9.      Exhibit I to the Subcontract is identified as the "proposed" Project schedule that was "intended to outline the general sequence of the work and critical milestones dates" for the Project.  The Exhibit I schedule had a data date of September 15, 2016 and showed that BAM's metal panel work for Floors 8 through 25 would be able to be installed and complete by August 31, 2018.

10.      In late June 2017, shortly after the parties entered into the Subcontract, W-T issued a new schedule to BAM and other subcontractors setting forth the planned sequence, durations and other details for the exterior work on the building's skin (the "Building Envelope Schedule"), which was the majority of BAM's Project work.  This initial Building Envelope Schedule had a data date of June 30, 2017 and divided up the building façade into a number of different work zones.

11.      W-T submitted updates to the Building Envelope Schedule periodically throughout the Project.  According to the March 1, 2018 update, BAM was to start installing its metal panels on Floor 8, complete its work on Floor 8 and then proceed to the floor immediately above until finishing at the Penthouse Level.

12.     BAM's metal panel installation at Floor 25 in the March 1, 2018 update to the Building Envelope Schedule was projected to be complete on October 8, 2018 and not until December 14, 2018 in the September 2018 update—nearly three and a half (3.5) months later than what the Exhibit I schedule showed for the projected completion of this same work.

13.     Once BAM completed its metal panel work on Floors 8 through 25, the Building Envelope Schedule and its updates showed that BAM was to mobilize to the ground-level retail areas and then complete its louver and grille work, as well as install the remaining metal panels.

Early Project Disruptions Prior to BAM's Mobilization

14.     BAM was to fabricate thermoplastic panels that were customized specifically for this Project before mobilizing to the Project site.  However, even before BAM could mobilize to the Project site, BAM's metal panel work was disrupted and impaired by W-T's various design changes, design errors, misrepresentations and/or other actions and inactions that resulted in (1) BAM performing additional work, (2) BAM incurring additional costs and (3) other disruptions to BAM's work.

15.     In August 2017, BAM submitted its first shop drawing submittal for the thermoplastic core panels.  WDG Architecture, PLLC (the "Architect") commented that the metal panels were to terminate into the building's curtainwall system.  However, W-T had previously changed the curtainwall system and the new system did not contain a channel where BAM could install its panels.  The Architect repeatedly made this comment on BAM's subsequent shop drawing submittals despite the change in the building's curtainwall system by W-T.

16.     In October 2017, the Architect changed the design of the perforated screens that BAM had already manufactured when it issued Architect's Supplemental Instruction ("ASI") 33.

17.    While on site for a February 2018 Project meeting, which is the same month when BAM was to start installing metal panels on Floor 8 according to the Exhibit I schedule, BAM noticed that the framing subcontractor, whose work is a predecessor to BAM's work, had not installed the metal framing system in the proper location and issued Nonconforming Work Notice ("NCW") 0001 to W-T.

18.    As a result of the incorrect framing installation, BAM sent a survey crew to review the ongoing framing work because it would affect BAM's metal panel installation in the future.  BAM decided to perform this inspection at this time because it would be impossible to inspect once the areas were covered by follow-on work such as sheathing and waterproofing. During these February 2018 inspections, BAM noticed additional installation errors with the Project's stud framing and raised them to W-T in NCW-0002.

19.    Also, in February 2018, the Architect commented on BAM's metal panel shop drawing submittal that BAM was to align the metal panel joints with the window mullions and incorporate certain modifications into its submittal and resubmit for approval.  However, BAM informed W-T that W-T needed to provide BAM the locations of the window mullions before BAM could resubmit its submittal for approval.  W-T could not provide this information with specificity because these windows were being stick built in the field and, as a result, field measurements would be required prior to BAM's fabrication of the metal panels.  Consequently, BAM could not resubmit its shop drawings until March 2019 once W-T provided the needed dimensions.  In addition, W-T did not even build the areas as planned, thus forcing BAM to issue additional NCWs that prevented and disrupted BAM from ever fabricating or installing the metal panels on the ground floor and retail areas before W-T's wrongful termination for default in April 2019.

20.    In March 2018, the Architect changed the Project design by requiring flashing materials to be installed at the curtainwall sills to flash water out of the curtainwall system.  At W-T's direction, BAM submitted its Change Order Request ("COR") 009 for the associated costs and proceeded to fabricated and deliver the flashing to W-T, which was installed by others. Despite W-T's initial rejection of BAM's COR 009, W-T eventually executed a change order agreeing that BAM is owed additional costs for this work.  BAM requested payment for this work in Payment Application No. 16 for December 2018, but W-T never paid BAM for this work.

21.    The Architect once again changed the design of the perforated metal screens that BAM was to supply under the Subcontract when it issued ASI 34 in April 2018.  These perforated metals screens were one of the three (3) primary scopes of work in BAM's Subcontract.

22.    Once BAM was able to determine the engineering and manufacturing influence on its perforated screen work due to the design changes in ASI 33 and ASI 34, BAM submitted COR 010 in the original amount of $100,160.25 for costs associated with these design changes. BAM's final version of COR 010 was for $93,356.74.  BAM and W-T eventually incorporated this required changed work into Subcontract Supplement 002 that W-T executed.  BAM performed this work and requested payment in Application for Payment No. 16 that BAM submitted in December 2018.  Despite W-T's representation that BAM would be paid, W-T still has not paid BAM for this completed work.

Project Disruptions Continued After BAM's Mobilization to the Project Site

23.    Once W-T directed BAM to mobilize to the site in June 2018 to commence its metal panel installation on Floor 8, which was only two plus months before BAM was to have

finished its metal panel installation according to the Subcontract's Exhibit I schedule, BAM's work was significantly disrupted and hindered by incomplete and/or late predecessor work, construction defects in the predecessor work once it was performed by the predecessor trades, design changes, design errors and/or other disruptions.

24.    On June 4, 2018, BAM attempted to mobilize to the Project site, but soon discovered that multiple façade zones that should have been open and available for BAM to perform work according to the Building Envelope Schedule and its updates were not accessible. BAM realized that W-T had misrepresented that the Project was far enough along for BAM to mobilize to the Project site.  BAM also could not install its swing stages, which were BAM's work platforms hung onto the side of the building that were necessary to install metal panels on Floors 8 through 25.  Specifically, BAM advised W-T in a June 5, 2018 letter that 45% of the work areas on Floors 8 through 12 were not accessible because other trades were still working there, including the mason's scaffolding.

25.    By mid-June 2018, BAM still could not get roof access at any façade zone to set its swing stages.  BAM had no choice but to set up its equipment and swing stages elsewhere.  At W-T's direction, BAM set up its swing stages on Floor 25, but only at the east and west elevations.  However, BAM could not perform any work from these swing stages because predecessor trades were still working at the east and west elevations.

26.    At the same time, BAM also discovered that the incorrectly installed stud framing work that BAM brought to W-T's attention in NCW-0001 and NCW-0002 more than 4 months prior was never corrected.  BAM itself eventually had to provide additional materials and labor in order to connect its metal panels to the deficient stud framing system.

27.     In addition to incomplete predecessor work and noncompliant framing work that prevented BAM from performing its work, on or about June 28, 2018, BAM submitted NCW-0005 to W-T with photographs, videos and other documents establishing that the installed waterproofing was noncompliant.  In the trade sequence established in W-T's schedules, the waterproofing work was to occur before the window wall and metal panel work could be installed.  BAM was prevented from installing its metal panel work due to the deficient and incomplete waterproofing because the waterproofing must be correctly installed before BAM could install the metal panels.  The video files provided by BAM show the deficient condition of the waterproofing on June 28, 2018, before BAM started installing any work.  Specifically, the videos demonstrate that water was behind the waterproofing and was actually being trapped there on the inside.

28.     In response to BAM's numerous notices regarding the noncompliant waterproofing work that was negligently managed, supervised and overseen by W-T, W-T intentionally disrupted and prevented BAM's metal panel work by taking over BAM's swing stage equipment to perform quality inspections of waterproofing using BAM's equipment.  If W-T had not negligently managed, supervised and overseen the waterproofing work in the first place, then these quality inspections would have been performed prior to BAM's mobilization to the site.  BAM could not utilize its own swing stages when W-T was performing waterproofing inspections, and thus BAM could not perform any of its metal panel work on Floors 8 through 25.

29.     Once W-T allegedly completed its first round of waterproofing quality inspections, W-T then instructed BAM to permit W-T's waterproofing subcontractor access to BAM's swing stages so that remediation work could be performed.  When W-T's waterproofing

subcontractor was utilizing BAM's swing stages, BAM again could not perform its work because only one contractor can utilize the swing stages at a time.

30.    While BAM was prevented from performing its metal panel work on Floors 8 through 25, BAM looked into performing other scopes of its work, even if such performance would not be in the planned sequence as shown in W-T's schedules.  However, BAM was also unable to install metal panels at the ground level and retail areas because of design conflicts and incomplete predecessor work.  In late July 2018, W-T instructed BAM to hold off on fabricating the metal panels for the ground level and retail areas because of discrepancies in the Project drawings.  In fact, W-T directed BAM to hold off on fabricating these panels until field measurements could be taken once the predecessor work was installed, which did not occur until February 2019.

31.    As of July 31, 2018, the disruptions to BAM's metal panel installation on the upper levels, which were caused by W-T's intentional misconduct in failing to remedy the defective stud framing and waterproofing work that BAM brought to W-T's attention, continued. At that time, BAM understood that W-T's stud framer refused to remediate any of its noncompliant work.  Therefore, BAM had no choice but to install strapping itself where it was needed on the stud framing in order for BAM to install its metal panels.  BAM also needed to cut through installed drywall sections in order to access and remediate the defective stud framing.  In addition, the waterproofing subcontractor continued to utilize BAM's swing stages to remediate the incorrectly installed waterproofing while BAM performed the remedial framing work.  BAM submitted COR 013 to W-T due to the above-discussed noncompliant/defective predecessor work, prevention of site access, resequencing, working in a piecemeal fashion and other disruptions that resulted in additional costs to BAM for (1) performing this out-of-scope work;

(2) downtime because BAM could not utilize its own swing stages when another contractor was utilizing them; and (3) other disruptions. BAM requested these costs because they were not BAM's responsibility and not contemplated by the Subcontract. However, W-T refused to pay BAM for COR 013 despite W-T's intentional misconduct in failing to remedy the defective stud framing and waterproofing work, as well as W-T's misrepresentations regarding the availability of certain work areas where BAM could perform its work.

32.     On or about August 8, 2018, W-T's window wall subcontractor informed BAM that all of the precast concrete panels at the east and west elevations were installed at the improper location. BAM issued NCW-0012 to document these issues and inform W-T that these deficiencies prevented BAM from completing its work on a single floor at the east and west elevations. Moreover, because of the defective installation of precast panels at the east and west elevations, BAM's 135 custom-made metal panels would no longer fit properly at these locations.

33.     W-T did not issue any direction to BAM on how to overcome the deficient precast installation until more than four (4) months later when, on December 21, 2018, W-T issued Cost Event 501 to BAM. On the same day, BAM issued its COR 019 to W-T suggesting that BAM should re-fabricate 135 panels. However, W-T rejected BAM's proposal because it would take too much time and would cost too much. On January 10, 2019, BAM submitted its COR-019-1 suggesting modification of the existing panels already manufactured by BAM; however, W-T rejected BAM's proposed because it would take too much time. On February 13, 2019, BAM submitted its COR-019-2 proposing that panels already fabricated in BAM's facility for installation in other Project areas could be modified and then brought to the site for installation at the east and west elevations. W-T approved this plan and BAM went ahead and modified 168

panels in total, including 33 more panels than BAM had initially anticipated.  Again, this disrupted and prevented BAM from performing its metal panel work on the entire east and west elevations of the building on Floors 8 to 25.  BAM shipped these modified panels to the Project site on or about March 4, 2019.  Because the panels that BAM modified were originally fabricated for installation in other areas of the Project, BAM now had to fabricate new panels for the other areas of the Project.  W-T's negligent management, supervision and overseeing of predecessor work disrupted BAM and prevented BAM from performing its entire metal panel work on each floor at the east and west elevations.

34.     As of August 10, 2018, which was approximately three (3) weeks before the Subcontract's Exhibit I schedule showed that BAM's metal panel work on Floors 8 through 25 should have been installed, the Project's web cam clearly showed that the predecessor trades required before BAM's work could proceed were nowhere close to being finished and were significantly behind schedule.  According to the Exhibit I Subcontract schedule, installation of window wall was to begin on Floor 25 on August 13, 2018.  However, the same web cam photographs clearly show that no window walls were yet complete above Floor 16.  The same web cam photographs also show that the waterproofing remained incomplete on all of the balconies and in other areas.  BAM's metal panels on these floors were installed in October 2018, but were later removed by W-T to remediate the defective waterproofing, and remained uninstalled as of the termination date—April 5, 2019.

W-T Improperly Issued the September 2018 Default Notice

35.     On September 10, 2018, W-T and its exterior envelope consultant finally realized the seriousness of the global construction defect with the installed waterproofing work after failing an inspection and, as a result, W-T implemented new quality control procedures.  Once

again, W-T intentionally took over complete control of BAM's swing stages and hired Alliance

Exterior Construction ("Alliance") to remove BAM's previously installed metal panels and to

perform corrective action on the waterproofing.  As with the previous instances when W-T took

control of BAM's swing stages, BAM was prevented from completing its own work and suffered

other disruptions.

36.    Despite the previously described actions and inactions by W-T that prevented

BAM's work performance since the parties executed the Subcontract in June 2017, including the

global waterproofing defect that W-T had recently acknowledged on September 10, W-T sent

BAM a notice of default, on or about September 12, 2018 (the "September 2018 Default

Notice"), due to BAM's alleged:

> (1) Failure to pursue work in accordance with the schedules established by W-T;
>
> (2) Interference with the operations of W-T and its subcontractors; and
>
> (3) Failure to diligently perform the work as directed under disputed changes per
> Article 6.a of the Subcontract.

37.    On or about September 17, 2018, BAM sent a detailed response to the September

2018 Default Notice explaining (1) why BAM was not in default, (2) why W-T was the party

actually in default, and (3) why W-T failed to perform its Subcontract obligations.  In BAM's

detailed response, BAM again notified W-T that the Project's waterproofing defects/deficiencies

were still not resolved when W-T issued the September 2018 Default.  BAM also notified W-T

of the disruptions that W-T's intentional misconduct and misrepresentations were having on

BAM's performance.  W-T improperly issued the September 2018 Default Notice and never

even responded in writing to BAM's detailed response to the September 2018 Default Notice.

38.    On September 21, 2018, BAM and W-T met to discuss BAM's installation

progress and BAM provided recent photographs demonstrating the waterproofing was still

incomplete and defective on every floor at every elevation. Once again, W-T and its waterproofing subcontractor utilized BAM's swing stages to complete the north elevation's waterproofing. W-T told BAM that the north elevation's waterproofing would be complete by September 28, 2018. However, on September 28, 2018, the north elevation's waterproofing remained incomplete and BAM received a Stop Work Notice from W-T due to "air barrier deficiencies" (i.e., waterproofing), which was preventing BAM from performing its work. BAM provided W-T with notice of disruptions to BAM's work that were a result of the incomplete waterproofing and Stop Work Notice in NCW-0019.

39.    Based on the disruptions described above, BAM submitted, on or about October 30, 2018, COR 017 seeking $96,476.20 for costs incurred by BAM as a result of W-T's recent actions and inactions on the Project, including W-T's intentional misconduct by repeatedly taking control of BAM's swing stages, thus preventing BAM from performing its own work as planned.

40.    Upon information and belief, after realizing that Alliance's hourly rates were significantly higher than other contractors, W-T hired Bolimex Construction in December 2018 to continue removing BAM's previously installed panels and to continue performing remedial work on the waterproofing. Similar to the other instances when W-T intentionally took over BAM's swing stages, BAM could not perform its work when other contractors, such as Alliance, WJE, W-T, Prospect, and Calvert, were utilizing BAM's swing stages.

New Issues Arise in Late 2018 and Early 2019

41.    BAM's work continued to be disrupted by new issues that were unrelated to the Stop Work Notice and the ongoing waterproofing issues discussed above.

W-T's actions and inactions discussed below resulted in (1) BAM performing additional work, (2) BAM incurring additional costs and (3) other disruptions to BAM's work.

42.    On December 5, 2018, BAM discovered additional work installed by other trades that did not comply with the construction drawings.  BAM issued NCW-0027 to notify W-T that BAM could not install the aluminum header/jamb panels surrounding the ground floor window as originally designed because the masonry work already in place at these locations made some of the fasteners impossible to reach.  The Architect and W-T ultimately decided that, in order for to BAM to install the aluminum header/jamb panels as originally designed, a structural adhesive to alleviate fastening requirements must be applied.  As a result, BAM had to modify its panel fabrication to accommodate this change.

43.    On the same day, BAM issued NCW-0028 notifying W-T of design errors and installation misalignments in the corner areas where the louvers and metal panels in the retail areas were to be installed.  These misalignments prevented BAM from fabricating the louvers and metal panels in the retail areas.

44.    Also, on December 5, 2018, BAM issued NCW-0029 because the stud framing that extended down into the middle of the rough openings at the ground floor louvers actually caused an interference with the vertical perimeter metal panels in these locations.  BAM never received any information prior to termination as to how this defective work was to be resolved in order to permit the installation of BAM's follow-on metal panel work.

45.    BAM notified W-T, on January 9, 2019, that BAM's work on the Penthouse Level of the Project was disrupted because the predecessor metal stud framing work there was still incomplete.  On January 14, 2019, W-T responded that any fabrication on the Penthouse Level must be based on field measurements.  A few days later, BAM became aware that W-T

had not only failed to install the metal studs, but learned that W-T had not even engineered the metal studs yet.

46.     On January 19, 2019, W-T intentionally breached its Subcontract obligations by forcibly breaking and entering into BAM's locked and secured storage area for materials and stealing all of BAM's system components, hardware, fasteners, etc., thus preventing BAM from performing its work and producing any further installation at that time.  BAM caught W-T in the act by a security motion camera that had been installed by BAM's Site Superintendent.

W-T Takes Over BAM's Work Yet Again

47.     Despite W-T's numerous actions and inactions described above, including W-T's intentional misconduct and misrepresentations, that prevented BAM's work performance, W-T sent BAM a notice of supplementation in January 2019.  Without providing any justification or prior notice whatsoever and completely ignoring BAM's prior notices of design changes, design defects, hindrances, intentional misconduct, lack of site access, incomplete and defective predecessor work, misrepresentations and other disruptions, W-T's January 15 letter alleges that, *inter alia*, BAM's metal panel installation was not progressing at a satisfactory pace.

48.     On January 23, 2019, BAM submitted a comprehensive response disputing and rebutting W-T's January 15, 2019 letter by providing a chronology of events with progress photographs of BAM's metal panel installation and disruptions thereto utilizing Floor 8 as an example which is summarized below:

- 10/15/2018 – BAM had completed installation of metal panels.

- 10/16/2018 – W-T intentionally started to remove the BAM-installed metal panels without any notification to BAM.

- 12/6/2018 – W-T started to reinstall the previously-removed panels.

- 12/9/2018 – W-T finished reinstalling the previously-removed panels.

- 1/19/2019 – W-T once again intentionally started to remove the metal panels without any notification to BAM.

- 1/22/2019 – W-T was performing repair work on the deficient waterproofing.

49.    W-T utilized these supplemental forces to remove and replace BAM's metal panels already installed in order to repair the defective waterproofing.  W-T's supplemental forces also damaged BAM's installed metal panels when W-T removed and later reinstalled the panels.

W-T Improperly Issued the March 2019 Default Notice and the Termination Notice

50.    Even though W-T yet again took over BAM's work in January 2019 and prevented BAM from performing its own work due to, *inter alia*, the supplemental forces utilizing BAM's swing stages, on March 5, 2019, W-T sent BAM a second notice of default (the "March 2019 Default Notice") because of BAM's alleged:

- Failure to pursue the work in accordance with the schedule, including the failure to "fabricate and deliver to the project the materials under this subcontract within the contractually agreed upon durations for this material;" and

- Failure to supply sufficient and properly skilled manpower.

51.    W-T, not BAM, is the party that prevented BAM's performance of the Subcontract and improperly issued the March 2019 Default Notice.  For example, W-T intentionally took over BAM's swing stages and/or metal panel work scope in order to investigate and/or remediate the Project's deficient waterproofing in June, July, September, October, November and December 2018, as well as in January 2019.

52.    On March 6, 2019—the very next day after BAM issued its March 2019 Default Notice—BAM had shipped the remaining metal panels to the site, thus curing any alleged default involving late delivery of materials.  This shipment included the last of the panels that

BAM was to supply under the Subcontract.  Specifically, the shipment included 454 panels, 168

of which had to be re-fabricated by BAM as part of the CE 501 issue discussed above due to the

dimensional conflict and incorrectly installed precast panels that disrupted BAM's work on every

floor at the west elevation.  BAM shipped these panels to the Project site despite the fact that W-

T never paid BAM for these re-fabricated panels.

53.    W-T sent this March 2019 Default Notice while the parties were, at the same

time, discussing the crippling significance of the waterproofing deficiencies and other issues that

were disrupting BAM's work and even reached an agreement in principle where (1) BAM would

receive a payment of $1,205,475.54 from W-T; (2) W-T would receive a credit from BAM for

work it was not yet able to complete; and (3) the parties agreed to close out the Subcontract.

54.    Instead, only a month after its March 2019 Default Notice, and the day after BAM

had shipped the remaining metal panels to the Project site, W-T took the drastic step of

terminating the Subcontract for default.  On April 5, 2019, W-T issued a letter that states the

following, in part:

> This letter constitutes notice of termination, pursuant to Article 7 of
> the above referenced Subcontract between Whiting-Turner and
> Bunting Architectural Metals, for the reasons set forth in the notices
> of default previously sent to Bunting Architectural Metals and the
> continuing failure and refusal of Bunting Architectural Metals to
> cure such defaults and to perform its obligations under the
> Subcontract.

55.    W-T's Termination Notice does not raise any new grounds for termination other

than those previously raised in the September 2018 Default Notice and the March 2019 Default

Notice.  This Termination Notice was wrongful, improperly issued without justification and

constitutes a material breach of the Subcontract because there was no default or other grounds

justifying termination.  In fact, W-T was the party that had materially breached the Subcontract,

including in, but not limited to, the following ways:

- W-T's predecessor work to BAM's work was both defective and incomplete when it was time for BAM to start installing metal panels per W-T's Project schedules, including the Building Envelope Schedule and its updates;

- W-T prevented BAM from accessing the site to perform its work in order to maintain progress according to W-T's Project schedules;

- W-T intentionally and improperly took over control of BAM's equipment and work on numerous occasions throughout BAM's duration on the Project;

- W-T improperly and negligently managed the Project, including, but not limited to, failing to manage, schedule and coordinate work on the Project;

- W-T failed to grant time extensions requested by BAM, and failed to approve and pay CORs submitted by BAM;

- W-T forcibly broke into and entered BAM's locked and secured storage area for materials and stole all of BAM's system components, hardware, fasteners, etc.;

- W-T failed to pay BAM for work performed in accordance with the Subcontract's payment terms; and

- W-T failed to issue Disputed Change Request Authorizations when disputes arose whether certain work was in BAM's Subcontract scope of work.

<u>W-T Failed to Make Payments as Required by the Subcontract</u>

56.    In addition to W-T's various design changes, design errors, hindrances,

intentional misconduct, lack of site access, incomplete and defective predecessor work,

misrepresentations and other disruptions to BAM's work, W-T also materially breached the

Subcontract by failing to pay BAM in a timely manner as required by the express terms of the

Subcontract.

57.     The Subcontract set forth very specific procedures regarding invoices for work performed by BAM on the Project, as well as specific procedures that W-T was to follow when paying BAM for work performed and invoiced.

58.     BAM was to submit an Application for Payment to W-T no later than the 20th of the month for work BAM performed in each month throughout the Project.  *See* Exhibit 1, Subcontract, Exhibit G(I).

59.     Exhibit G to the Subcontract also required that "[a]fter BAM invoices are received by [W-T] by the 20th day of each month, [W-T] will submit an invoice to the Owner by the 25th day of that same month."  *See* Exhibit 1, Subcontract, Exhibit G(II)(A).

60.     W-T was required to pay BAM "an amount equal to ninety percent (90%) or such higher percentage as required by applicable law of the value of the work performed by [BAM] as determined by the Architect and approved by [W-T] during any calendar month within fifteen (15) days after payment therefor has been received by [W-T] from the Owner, or within such shorter period specified by applicable law, statute or regulation."  *See* Exhibit 1, Subcontract, Art. 5(a).

61.     The Subcontract also required W-T to pay BAM "within 45 days" of the date of each BAM Application for Payment.  *See* Exhibit 1, Subcontract, Exhibit G(V).

62.     In total, BAM submitted seventeen (17) Applications for Payment for work it performed on the Project.  BAM's Application for Payment No. 1 was for work it performed in June 2017 and Application for Payment No. 17 was for work it performed in January 2019.

63.      On multiple occasions, W-T materially breached the Subcontract by failing to pay BAM in a timely manner as required by the express terms of the Subcontract.

64.     W-T also failed to make payment of amounts due BAM, either in part or in full, for a number of different BAM Applications for Payment submitted by BAM on the Project.

65.     BAM notified W-T of W-T's failure to make payments in a timely fashion and W-T's failure to make payment, either in part or in full, on multiple occasions throughout the Project.

## COUNT I
## (BREACH OF CONTRACT)

66.     BAM hereby incorporates the allegations in Paragraphs 1-65 as if fully set forth herein.

67.     The Subcontract is a legally enforceable agreement between BAM and W-T.

68.     W-T materially breached the Subcontract by improperly issuing the Termination Notice and wrongfully terminating the Subcontract for default without the existence of any proper default or other grounds justifying termination.

69.     W-T also materially breached the Subcontract by its actions and inactions including, but not limited to, the following ways:

- W-T's predecessor work to BAM's work was both defective and incomplete when it was time for BAM to start installing metal panels per W-T's Project schedules, including the Building Envelope Schedule and its updates;

- W-T prevented BAM from accessing the site to perform its work in order to maintain progress according to W-T's Project schedules;

- W-T intentionally and improperly took over control of BAM's equipment and work on numerous occasions throughout BAM's duration on the Project;

- W-T improperly and negligently managed the Project, including, but not limited to, failing to manage, schedule and coordinate work on the Project;

- W-T failed to grant time extensions requested by BAM, and failed to approve and pay CORs submitted by BAM;

- W-T forcibly broke into and entered BAM's locked and secured storage area for materials and stole all of BAM's system components, hardware, fasteners, etc.;

- W-T failed to pay BAM for work performed in accordance with the Subcontract's payment terms; and

- W-T failed to issue Disputed Change Request Authorizations when disputes arose whether certain work was in BAM's Subcontract scope of work.

70.    Inherent in every contract is the duty of good faith and fair dealing and the duty on the part of each party to cooperate with and not to interfere with the ability of the other party to perform its contractual obligations in an orderly and efficient manner.

71.    W-T breached both its duty of good faith and fair dealing and its duty to cooperate with and not to interfere with the ability of BAM to perform its contractual obligations in an orderly and efficient manner by W-T's own actions and inactions including, but not limited to, its failure to pay BAM in a timely manner or failure to pay BAM at all, its failure to manage, supervise and oversee the Project work and assure completion of predecessor work, its misrepresentations to BAM regarding the status of work completed by predecessor trades on the Project, its intentional actions and inactions in preventing BAM from performing its work on the Project, its negligence in failing to coordinate work and the trades, its failure to provide BAM with access to its work on the Project, its failure to ameliorate significant schedule disruptions to the Project, and its intentional failure to administer the Subcontract's change order process.

72.    As a result of W-T's breaches of the Subcontract, BAM has suffered damages in excess of $75,000.

WHEREFORE, Plaintiff Bunting Graphics, Inc. d/b/a Bunting Architectural Metals hereby respectfully requests judgment on Count I of this Complaint in its favor and against Defendant The Whiting-Turner Contracting Company in an amount in excess of $75,000, as well

as attorneys' fees, consultants' fees, expenses, interest, and costs, and other such relief as the Court deems proper and just under the circumstances.

## COUNT II
### (QUANTUM MERUIT/UNJUST ENRICHMENT)
### (IN THE ALTERNATIVE)

73.    BAM hereby incorporates the allegations in Paragraphs 1-65 as if fully set forth herein.

74.    BAM conferred a benefit on W-T in the form of providing valuable labor, services and materials for the Project.

75.    W-T benefited from the valuable labor, services and materials that BAM provided for the Project.   W-T knows that BAM conferred this benefit on W-T and W-T knows that BAM required payment for this benefit, yet W-T accepted and retained such benefit.

76.    W-T has failed and refused to pay BAM for all valuable labor, services and materials it provided for the Project.

77.    W-T's continued retention of such benefit is inequitable and will continue to be so unless payment to BAM for all valuable labor, services and materials that BAM provided for the Project is made.

78.    As a result of W-T's failure to pay BAM for all valuable labor, services and materials it provided for the Project, BAM has suffered damages in excess of $75,000.

WHEREFORE, Plaintiff Bunting Graphics, Inc. d/b/a Bunting Architectural Metals hereby respectfully requests judgment on Count II of this Complaint in its favor and against Defendant The Whiting-Turner Contracting Company in an amount in excess of $75,000, as well as attorneys' fees, consultants' fees, expenses, interest, and costs, and other such relief as the Court deems proper and just under the circumstances.

Dated: August 13, 2019

Respectfully submitted,

BUNTING GRAPHICS, INC.

By counsel:

  /s/ Robert D. Windus
Robert D. Windus (Md. Bar No. 911219)
MOORE & LEE, LLP
1751 Pinnacle Drive, Suite 1100
McLean, VA 22102
Telephone:  (703) 506-2050
Facsimile:  (703) 506-2051
Email: r.windus@mooreandlee.com
       d.todd@mooreandlee.com