**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

<table>
<tr><td>

BUNTING GRAPHICS, INC.
d/b/a Bunting ARCHITECTURAL
METALS,

      Plaintiff/Counter-Defendant,

v.

THE WHITING-TURNER
CONTRACTING COMPANY,

      Defendant/Counterclaimant.

</td><td>

)
)
)
)
)
)
)
)
)
)
)
)
)

</td><td>

Civil Action No. 19-cv-2323-LKG

Dated: January 23, 2025

</td></tr>
<tr><td>

THE WHITING-TURNER
CONTRACTING COMPANY,

      Third-Party Plaintiff,

v.

TRAVELERS CASUALTY AND
SURETY COMPANY OF AMERICA,

      Third-Party Defendant.

</td><td>

)
)
)
)
)
)
)
)
)
)
)
)
)

</td><td></td></tr>
</table>

## MEMORANDUM OPINION

## I.    INTRODUCTION

This civil action involves breach of contract, quantum meruit and unjust enrichment claims and counterclaims related to a subcontract for the construction of a high-rise, mixed use building located in Arlington, VA (the "Subcontract"), entered into by Plaintiff, Bunting Graphics, Inc. ("Bunting"), and Defendant, The Whiting-Turner Contracting Company ("Whiting-Turner"). *See generally* ECF Nos. 1 and 11. The Court held a five-day trial on the parties' claims and counterclaims from March 18, 2024, to March 22, 2024. ECF Nos. 188, 189, 195, 197 and 199. Following the trial, the parties submitted post-trial briefs. ECF Nos. 212, 213, 214, 220, 221 and 222. The Court heard closing arguments on December 12, 2024. ECF No. 233.

For the reasons set forth below, the Court **CONCLUDES** that: (1) Bunting materially breached the Subcontract, by: (a) failing to timely mobilize to the Project site in May 2018; (b) failing to complete the fabrication of the metal panels in September 2018; and (c) failing to make progress on, or complete, installation of these panels by September 2018 and by January 2019; (2) Whiting-Turner did not materially breach the Subcontract prior to Bunting's material breaches; (3) Bunting is **LIABLE** to Whiting-Turner for its material breaches of the Subcontract; and (4) Travelers is also **LIABLE** to Whiting-Turner for Bunting's material breaches of the Subcontract, up to the amount of **$2,652,500.00**.

## II.    FINDINGS OF FACT

### A.  Factual Background

Overview Of The Case

This case involves a dispute about which party breached the Subcontract for the construction of a high-rise, mixed use building located in Arlington, VA.  In this regard, Bunting alleges that Whiting-Turner materially breached the Subcontract by, among other things: (1) wrongfully issuing defective design documents; (2) wrongfully terminating the Subcontract; (3) negligently managing the construction project at issue in this case; (4) interfering with Bunting's and other subcontractors' work on that project; (5) wrongfully issuing notices of default to Bunting for its work; (6) wrongfully supplementing Bunting's work; and (7) failing to pay Bunting in a timely manner, or at all, for its work.  *See generally* ECF No. 1.

Whiting-Turner counters that it did not breach the Subcontract and argues that Bunting materially breached the Subcontract by, among other things: (1) failing to submit shop drawings for certain architectural louvers and metal panels; (2) failing to timely complete fabrication of metal panels; (3) failing to timely mobilize to the Project site to begin installation of the metal panels; (4) failing to timely progress installation of the metal panels; and (5) failing to complete installation of metal panels and other Subcontract deliverables.  *See* ECF No. 11 at ¶¶ 6-35.

In addition, Whiting-Turner asserts a counterclaim against Third-Party Defendant, Travelers Casualty and Surety Company of America ("Travelers")—which issued a Performance Bond on behalf of Bunting for the construction project at issue—alleging that Travelers breached that Performance Bond by failing to perform its obligations under the Performance Bond.  *See id.* at ¶¶ 36-42.  The Court held a five-day trial on the issue of liability in March 2024.  ECF Nos. 188,

189, 195, 197, 199.  The Court makes the following findings of fact, based upon the evidence presented at trial:

The Project

Whiting-Turner is the general contractor under a construction contract with PL Pentagon, LLC (the "Owner"), to construct a high-rise, mixed-use building known as Pentagon Centre Building A, which is located in Arlington, Virginia (the "Project").  ECF No. 213 at 6.  The Project is a 25-story building with one level of below-grade parking, one ground-level retail level, six above-grade parking levels, and 18 residential levels containing 440 units.  Joint Ex. 1 at WHITINGTURNER008282 (Subcontract at 1); ECF No. 207 at 65:22-23 (testimony of Firas Abdelahad describing number of levels in the Project building);  ECF No. 207 at 192:24-193:2 (testimony of John Maguire describing the Project); ECF No. 208 at 233:3-9 (testimony of Joshua Bunting describing residential and parking garage levels of the Project); ECF No. 210 at 192:17-19 (testimony of Eric Krahe describing Levels 8 to 25 of the Project).

The Subcontract And Project Schedule

In June 2017, Bunting and Whiting-Turner entered into the Subcontract, in the amount of $2,652,500.00, for Bunting to furnish labor, material, equipment and tools to perform the following three primary scopes of work for the Project: (1) thermoplastic core, or ACM panels ("metal panels"); (2) perforated metal screens; and (3) architectural louvers.  Joint Ex. 1 at WHITINGTURNER008282 (describing the Subcontract's subject) and WHITINGTURNER008289 (Subcontract at Art. 10, titled "Subcontract Amount"); ECF No. 208 at 204:10-15 (testimony of Joshua Bunting describing Bunting's scope of work for the Project). Pursuant to the Subcontract, Bunting was to engineer and specially fabricate the metal panels that were customized for the Project and then install these metal panels.  ECF No. 209 at 71:15-16 (testimony of Joshua Bunting stating that the panels were fabricated at Bunting's facility because they could not store all 3,000 panels on site).

A large majority of the 3,000 metal panels were to be installed on Levels 8 to 25 of the Project building.  In addition, the perforated metal screens were to be installed on Levels 5 to 8 of the Project and the louvers were primarily to be installed at the ground level.  ECF No. 207 at 67:5-9, 22-25 (testimony of Firas Abdelahad describing where the perforated metal screens were to be installed on the west elevation of the Project); ECF No. 209 at 37:4-5 (testimony of Joshua Bunting describing where architectural louvers were to be installed).

Pursuant to the terms of the Subcontract, Whiting-Turner agreed to pay Bunting in accordance with the following terms:

> Payment of amounts due under the Subcontract, shall be made as follows: The Contractor shall, pay to the Subcontractor an amount equal to ninety percent (90%) or such higher percentage as required by applicable law of the value of the work performed by [Bunting] as determined by the Architect and approved by [Whiting- Turner] during any calendar month within fifteen (15) days after payment therefor has been received by [Whiting-Turner] from the Owner, or within such shorter period specified by applicable law, statute or regulation."

Joint Ex. 1 at WHITINGTURNER008284 (Subcontract at Art. 5(a), titled "Payment"); ECF No. 209 at 62:20-63:1 (testimony of Joshua Bunting describing Art. 5(a) of the Subcontract). The Subcontract also required that Whiting-Turner pay Bunting "within 45 days" of the date of each Bunting Payment Application. Joint Ex. 1 at WHITINGTURNER008284 (Subcontract at Art. 5(a)), WHITINGTURNER008306 (Subcontract at Ex. G, § V, titled "Basis and Application for Payment"); ECF No. 209 at 63:9-15 (testimony of Joshua Bunting describing his understanding of Ex. G, § V of the Subcontract).

The Subcontract also incorporates the schedule for the Project.[1] Joint Ex. 1 at WHITINGTURNER008283 (Subcontract at Art. 4(a)), WHITINGTURNER008291 (Subcontract at List of Exhibits, stating that Exhibit I is incorporated into the Subcontract). In this regard, Exhibit I to the Subcontract provides the "proposed" Project schedule that was "intended to outline the general sequence of the work and critical milestones dates" for the Project (the "Baseline Project Schedule"). Joint Ex. 1 at WHITINGTURNER008316 (describing the Baseline Project Schedule), WHITINGTURNER008317-38 (Baseline Project Schedule). The Baseline Project Schedule shows a completion date of August 31, 2018, for Bunting's metal panel installation work for Levels 8 through 25. Joint Ex. 1 at WHITINGTURNER008316-17, 8327 (Baseline Project

---

[1] The Subcontract also contains the following integration clause:

> This Subcontract and the exhibits attached hereto and incorporated by reference herein contain the entire agreement of the parties with respect to the subject matter of this Agreement, and supersede all prior negotiations, agreements and understandings with respect thereto.

Joint Ex. 1 at WHITINGTURNER008289 (Subcontract at Art. 9(v)); ECF No. 209 at 160:10-161:1 (testimony of Joshua Bunting describing his understanding of Art. 9(v)).

4

Schedule at 1 and 11); ECF No. 208 at 231:12-233:20 (testimony of Joshua Bunting describing his understanding of the Baseline Project Schedule).

After the parties executed the Subcontract, Whiting-Turner issued new schedules for the planned sequence, durations and other details for the exterior work on the Project building's skin (the "Project Schedule Updates"). *See* Bunting Ex. 16 (March 1, 2018, Project Schedule Update); ECF No. 237-1 (May 1, 2018, Project Schedule Update)[2]; Bunting Ex. 80 (September 7, 2018, Project Schedule Update). These Project Schedule Updates divide the building façade into a number of different work zones. *See* Bunting Ex. 16 (March 1, 2018, Project Schedule Update); ECF No. 208 at 233:21-235:1 (testimony of Joshua Bunting regarding his understanding of the March 1, 2018, Project Schedule Update).

Pursuant to the March 1, 2018, Project Schedule Update, Bunting was: (1) to start installing its metal panels on Level 8; (2) complete its work on Level 8; and (3) then proceed to the level immediately above, until finishing at the penthouse level. Bunting Ex. 16 (March 1, 2018, Project Schedule Update); ECF No. 208 at 233:21-235:1 (testimony of Joshua Bunting regarding his understanding of the March 1, 2018, Project Schedule Update). Within the construction industry. this installation process is commonly referred to as the "cork screw" method. ECF No. 207 at 203:7-11 (testimony of John Maguire explaining the "cork screw" method); ECF No. 208 at 235:4-236:9 (testimony of Joshua Bunting regarding his understanding of the metal panel installation sequence based upon the March 1, 2018, Project Schedule Update). The March 1, 2018, Project Schedule Update also shows an October 8, 2018, completion date for Bunting's metal panel installation at Level 25. Bunting Ex. 16 at 27 (March 1, 2018, Project Schedule Update).

The September 7, 2018, Project Schedule Update shows a December 14, 2018, completion date for Bunting's metal panel installation at Level 25. Bunting Ex. 80 at 5 (September 7, 2018, Project Schedule Update); ECF No. 208 at 236:10-23 (testimony of J. Bunting regarding the December 14, 2018, completion date for the metal panel installation on Level 25). Once Bunting completed its metal panel work on Levels 8 through 25, the Baseline Project Schedule and its Updates provide that Bunting would mobilize to the ground level retail areas of the building to

---

[2] During the December 12, 2024, hearing, the Court directed the parties to submit the May 1, 2018, Project Schedule Update, which is undisputed. ECF No. 234. Bunting objects to the Court's consideration of the May 1, 2018, Project Schedule Update, because this evidence was not introduced at trial. ECF No. 236.

complete its louver and grille work and install the remaining metal panels at the ground level. *See* Joint Ex. 1 at WHITINGTURNER008317-38 (Baseline Project Schedule); Bunting Ex. 16 (March 1, 2018, Project Schedule Update); ECF No. 237-1 (May 1, 2018, Project Schedule Update); Bunting Ex. 80 (September 7, 2018, Project Schedule Update); ECF No. 210 at 213:16-25 (testimony of Eric Krahe explaining that the retail level metal panels would be installed after the completion of metal panel installation on the other levels of the Project building).

The Subcontract also provides that:

> If [Whiting-Turner] determined that [Bunting] is behind schedule or will not be able to maintain the schedule due to its own fault, Subcontractor shall submit a remedial plan to recover, shall work overtime, shift work, or work in an altered sequence, if deemed necessary, in the judgment of [Whiting-Turner] to maintain the progress of the work.

Joint Ex. 1 at WHITINGTURNER008282 (Subcontract at Art. 4(a), titled "Diligent Performance" (as amended by Ex. Q to Subcontract)); ECF No. 208 at 205:2-206:9, 206:23-207:11 (testimony of Joshua Bunting regarding how Ex. Q to the Subcontract amended Art. 4(a) of the Subcontract).

The Scope Of Work

With regards to the scope of work for the Project, Exhibit B to the Subcontract provides that Bunting is "responsible [for] check[ing] actual dimensions of adjacent and supporting construction by field measurements prior to fabrication of architecturally exposed structural steel" and that "[f]ield measurements shall be shown on shop drawing submittals." Joint Ex. 1 at WHITINGTURNER008295 (Subcontract at Ex. B, ¶ 15); ECF No. 209 at 35:13-36:12 (testimony of Joshua Bunting regarding the scope of work provision of the Subcontract). The Subcontract also requires that Bunting install the metal panels per the Project's specifications. Joint Ex. 1 at WHITINGTURNER00829 (Subcontract at Ex. B, ¶ 41); ECF No. 209 at 226:12-17 (testimony of Barkin Guner regarding Ex. B, ¶ 41 of the Subcontract).

In this regard, Project Specification 08 44 05 governs the Project's building façade work, including Bunting's metal panel work. Joint Ex. 7 (Project Specification 08 44 05). Part 1.2.A.1 of this Specification requires that a single contractor have the "undivided responsibility" for coordination of the building façade work. *Id.* at WHITINGTURNER022192. The construction administrator for the Project's architect, John Alvarado, testified that this "undivided responsibility" for the Project belonged to Whiting-Turner. ECF No. 207 at 177:7-178:25

6

(testimony of Jonathan Alvarado regarding the requirements of Project Specification 08 44 05).

Project Specification 07 42 00 governs the performance of Bunting's metal panel work. Joint Ex. 6 (Project Specification 07 42 00). Part 3.1(A)(1) of this Specification requires that Bunting examine the condition of preceding work and to "not proceed until unsatisfactory conditions have been corrected." *Id*. at WHITINGTURNER022059; ECF No. 209 at 50:3-51:2 (testimony of Joshua Bunting regarding his understanding of Part 3.1(A)(1)); ECF No. 209 at 226:18-227:14 (testimony of Barkin Guner regarding applicability of Part 3.1(A)(1) to Bunting's work).

<u>The Performance Bond</u>

Bunting and Travelers executed a performance bond (the "Performance Bond") that guaranteed Bunting's performance under the Subcontract. Joint Ex. 4 at 1 (Performance Bond). The Performance Bond is incorporated into the Subcontract by reference and provides that:

> WHEREAS, [Bunting] has by written agreement dated January 7, 2017 entered into Contract No. 015270-05C with [Whiting-Turner] for construction and installation of Thermoplastic Core Pa Perforated metal panels, Architectural Louvers in accordance with the drawings and specifications prepared by [Whiting-Turner] which Contract is made a part hereof, and hereinafter referred as a Contract.

Joint Ex. 4 at 1 (Performance Bond). The Performance Bond also provides that:

> [Bunting and Travelers] are held and firmly bound unto [Whiting-Turner] in the amount of [$2,652,500.00] for the payment whereof [Bunting] and [Travelers] bind themselves, their heirs, executors, administrators, successors, and assigns, jointly and severally, firmly by these presents. . .

*Id*.

In addition, the Performance Bond provides that:

> THE CONDITION OF THIS OBLIGATION is such, that if the above bounden [ Bunting ] shall well and truly perform all undertakings , covenants, terms, conditions, and agreements of said Contract within the time provided therein, any extensions thereof that may be granted by [Whiting-Turner], and during the life of any said guarantee under said Contract, and shall well and truly perform all of the undertakings   covenants, terms, conditions, and agreements of  any and all duly authorized modifications of said Contract that may hereinafter be made, and shall pay to [Whiting-Turner] and save harmless [Whiting-Turner] of and from any and

7

> all loss , damage, and expense, . . . which [Whiting-Turner] may
> sustain by reason of failure so to do, then this publication shall be
> null and void, otherwise it shall remain in full force and effect.

*Id*.  Lastly, the Performance Bond provides that:

> Whenever [Bunting] shall be declared by [Whiting-Turner] to be in
> default under the Contract, [Travelers] shall, within ten (10)
> calendar days after notice of default from [Whiting-Turner] notify
> [Whiting-Turner] of its election either to promptly proceed to
> remedy the default or promptly proceed to complete the [C]ontract
> in accordance with and subject to its conditions.  In the event that
> [Travelers] does not elect to exercise either of the above stated
> options, the [Whiting-Turner] thereupon shall have the remaining
> work completed, [Travelers] to remain liable hereunder for all
> expenses, including attorney's fees, of completion.

*Id.* at 2.

<u>Bunting's Mobilization To The Project Site And The September 2018 Default Notice</u>

Bunting mobilized to the Project site in June 2018.  ECF No. 208 at 129:21-24 (testimony

of Gary Shafer regarding Bunting's arrival at the Project site in June 2018); Bunting Ex. 355 at 13

(Supplemental Expert Disclosure of Joshua P. Bunting's Opinions, stating that "[o]n or about

June 18, 2018, [Bunting] mobilized to the Project site").  But, several challenges and delays to its

work soon followed.

Bunting alleges that it was unable to begin work once on site, due to the lack of swing

stages and access to the Project building's roof.  ECF No. 212 at 20.  Bunting also alleges that its

work was delayed due to incomplete work by predecessor subcontractors.  *Id*.; ECF No. 207 at

213:1-214:6, 214:21-215:5 (testimony of John Maguire regarding the impacts of the predecessor

subcontractors' work on Bunting's work).

The parties also agree that waterproofing issues at the Project site impacted Bunting's

work.  In this regard, it is undisputed that Bunting had to remove some of the metal panels that it

had previously installed, to help address waterproofing concerns at the Project.  Bunting Ex. 121

(October 29, 2018, email from Joshua Bunting to Barkin Guner regarding the removal of Bunting's

panels to investigate waterproofing issues); ECF No. 209 at 47:19-48:12 (testimony of Joshua

Bunting regarding the October 29, 2018, email).  In addition, Bunting acknowledged in its

Payment Application No. 13, for the period ending September 30, 2018, that only 25% of the

metal panels had been installed.  Whiting-Turner Ex. 212 (Payment Application No. 13 for the period ending September 30, 2018).

On September 12, 2018, Whiting-Turner sent Bunting a notice of default (the "September 2018 Default Notice"), due to Bunting's alleged:

- Failure to pursue work in accordance with the schedules established by Whiting-Turner: 1) Engineering and Manufacturing delaying installation of perforated panels. 2) ACM panel installation behind schedule. 3) Louver design/shop drawing behind schedule

- Interference with the operations of Whiting-Turner and its subcontractors: 1) Failure to provide details with the contract drawings for work outlined within Exhibit B Scope of Work, Balcony and Roof interior curb cover labeled 8H7 (Thermoplastic Core Panels); and

- Failure to diligently perform the work as directed under disputed changes per Article 6.a:1) Delivery of the ASI 33/34 material for perforated metal panel installation.

Bunting Ex. 85 (September 2018 Default Notice).  On September 21, 2018, Bunting sent a response to the September 2018 Default Notice (the "September 2018 Default Notice Response") stating that Bunting was not in default and that Whiting-Turner was in default of the Subcontract, because it failed to perform its obligations under the Subcontract.  Bunting Ex. 92 (September 2018 Default Notice Response); ECF No. 209 at 32:2-9 (testimony of Joshua Bunting regarding his preparation of the September 2018 Default Notice Response).

Whiting-Turner did not reply in writing to Bunting's September 2018 Default Notice Response.  ECF No. 209 at 43:22-44:3 (testimony of Joshua Bunting regarding the lack of a direct written response from Whiting-Turner to Bunting's September 2018 Default Notice Response).  Bunting argues that the September 2018 Default Notice is unfounded and constitutes a material breach of the Subcontract by Whiting-Turner.  ECF No. 212 at 42.

<u>Challenges With The Project Continue Into 2019</u>

On January 15, 2019, Whiting-Turner sent a letter to Bunting stating that Bunting's metal panel installation was "not progressing at a satisfactory pace" and that Whiting-Turner would be supplementing Bunting's metal panel installation crews with additional manpower (the "January 2019 Supplementation Letter").  Bunting Ex. 173 (the January 2019 Supplementation Letter); ECF No. 209 at 56:23-57:11 (testimony of Joshua Bunting regarding his understanding of the

January 2019 Supplementation Letter).  On January 23, 2019, Bunting sent a response to this letter (the "January 2019 Supplementation Letter Response") which disputes Whiting-Turner's characterization of Bunting's progress on the Project and provides the following timeline:

- 10/15/2018 – Bunting completed installation of metal panels.

- 10/16/2018 – Whiting-Turner started to remove the Bunting-installed metal panels without any notification to Bunting.

- 12/6/2018 – Whiting-Turner started to reinstall the previously-removed panels.

- 12/9/2018 – Whiting-Turner finished reinstalling the previously-removed panels.

- 1/19/2019 – Whiting-Turner once again started to remove the metal panels without any notification to Bunting.

- 1/22/2019 – Whiting-Turner was performing repair work on the deficient waterproofing.

Bunting Ex. 179 (January 2019 Supplementation Letter Response); ECF No. 209 at 58:4-60:16 (testimony of Joshua Bunting regarding the drafting and content of January 2019 Supplementation Letter Response).

On February 7, 2019, Bunting laid off all its workers, except for its superintendent.  ECF No. 211 at 42:20-23 (testimony of Daniel Ramsey regarding Bunting's layoff); *Id*. at 120:15-22, 121:22-122:1 (testimony of Joshua Bunting regarding Bunting's layoff).  During the trial, Daniel Ramsey of Whiting-Turner testified that Whiting Turner did not consent to this lay off, but it also "didn't object" to the layoff.  ECF No. 211 at 42:24-43:7 (testimony of Daniel Ramsey regarding Bunting's layoff).

Bunting contends that it laid off its workforce based upon an agreement that Bunting reached with Whiting-Turner, pursuant to which Bunting would supply the remaining materials for the Project and give Whiting-Turner access to Bunting's swing stages, and, in turn, Whiting-Turner would be responsible for the installation of those materials.  ECF No. 211 at 122:2-25 (testimony of Joshua Bunting regarding the formation and terms of the agreement).  Bunting contends that Joshua Bunting and Daniel Ramsey made this agreement.  *Id*. at 122:21-25.  But, Whiting-Turner disputes that the parties reached such an agreement.  ECF No. 213 at 27.

<u>The March 2019 Default Notice And Final Delivery Of Panels</u>

On March 5, 2019, Whiting-Turner sent Bunting a second notice of default (the "March 2019 Default Notice"), upon the following bases:

> Failure to pursue the work in accordance with the schedule.
> Bunting has failed to diligently pursue the work in accordance with Article 4 of the subcontract agreement. Specifically, Bunting has failed to fabricate and deliver to the project the materials under this subcontract within the contractually agreed upon durations for this material. At this time, all ACM material for the project per the scope of work should have been fabricated. Further, Bunting has refused to fabricate or to deliver fabricated materials due to a claimed dispute in violation of Article 4(d) of the Subcontract.
>
> Failure to supply sufficient and properly skilled manpower.
> In our letter dated January 15, 2019, Whiting-Turner noted the failure of Bunting personnel to actively pursue work on the project and that supplementation of Bunting's workforce would occur. This supplementation continues today with Bunting not providing any field installation currently.

Bunting Ex. 208 (March 2019 Default Notice); ECF No. 209 at 68:20-69:12 (testimony of Joshua Bunting regarding the bases of the March 2019 Default Notice).  Bunting disputes Whiting-Turner's claim that Bunting "[f]ail[ed] to pursue the work in accordance with the schedule… [and] to fabricate and deliver to the project the materials under this subcontract[.]"  ECF No. 209 at 70:2-11 (testimony of Joshua Bunting regarding the March 2019 Default Notice dispute, stating "Bunting had fabricated all of the work it could fabricate at that time.").  Bunting also disputes Whiting-Turner's claim that there was a "[f]ailure to supply sufficient and properly skilled manpower."  ECF No. 209 at 69:22-70:1 (testimony of Joshua Bunting regarding Whiting-Turner's "takeover" of panel installation).

In mid-March 2019, Bunting sent an email to Whiting-Turner advising, among other things, that "[t]here are 459 Panels fabricated and stored at our facility."  Bunting Ex. 218 (March 18, 2019, email from Joshua Bunting to Eric Krahe); ECF No. 209 at 70:17-25, 71:12-18 (testimony of Joshua Bunting regarding the March 18, 2019, email).  On March 26, 2019, Bunting stated that it was "going to ship the 459 panels[,]" but it was going to take a few days to accomplish this.  ECF No. 211 at 91:18-92:10, 95:5-96:1 (testimony of Laura Murphy regarding discussion with Bunting about the metal panel delivery).  Bunting ultimately delivered a final shipment of 459 metal panels to the Project site on April 16, 2019.  Bunting Ex. 242 (April 16,

2019, email from Eric Krahe to Dave Yedlowski regarding receipt of panel shipment); ECF No.
209 at 71:20-72:2, 76:20-24 (testimony of Joshua Bunting regarding the existence and delivery of
the remaining 459 metal panels).[3]

The April 2019 Termination Notice

On April 5, 2019, Whiting-Turner sent a letter to Bunting terminating the Subcontract (the
"April 2019 Termination Notice").  The April 2019 Termination Notice states, in relevant part,
that:

> This letter constitutes notice of termination, pursuant to Article 7 of
> the above referenced Subcontract between Whiting-Turner and
> Bunting Architectural Metals, for the reasons set forth in the notices
> of default previously sent to Bunting Architectural Metals and the
> continuing failure and refusal of Bunting Architectural Metals to
> cure such defaults and to perform its obligations under the
> Subcontract.

Bunting Ex. 229 (April 2019 Termination Notice); ECF No. 209 at 74:24-75:9 (testimony of
Joshua Bunting identifying the April 2019 Termination Notice).

On or about April 5, 2019, Whiting-Turner submitted an Application and Certificate for
Payment to the Project Owner for work completed on the Project in March 2019.  Bunting Ex. 231
(Application and Certificate for Payment No. 35).  This Application and Certificate for Payment
provides that:

> The undersigned Contractor certifies that to the best of the
> Contractor's knowledge, Information and belief the Work covered
> by this Application for Payment has been completed in accordance
> with the Contract Documents, that all amounts have been paid by the
> Contractor for Work for which previous Certificates for Payment
> were issued and payments received from Whiting-Turner, and that
> the current payment shown herein is now due.

*Id*. at 1; ECF No. 208 at 100:9-101:4 (testimony from Gary Shafer regarding Application and
Certificate for Payment No. 35).

---

[3] The parties disagree about whether Bunting was required to supply metal panels for the "inset balconies"
at the south elevation.  Bunting Ex. 340 (February 27, 2019, Letter from Dave Yedlowski regarding the
review of contract drawings for the inner courtyard balconies); ECF No. 209 at 82:3-18, 83:22-84:19, 85:7-
86:7, 86:14-87:2 (testimony of Joshua Bunting regarding Bunting's position that the inner courtyard
panels were not required); ECF No. 222 at 22 (citing ECF No. 210 at 194:18-23, 195:13-17 (testimony of
Eric Krahe regarding inset balconies)).

<u>Bunting's Claims Of Delay And Interference By Whiting Turner</u>

Bunting alleges that Whiting-Turner engaged in various conduct that that delayed, and/or interfered with, its work on the Project.

## 1. **Shop Drawings And The Building Façade Design Change**

First, Bunting contends that Whiting-Turner delayed its work on the Project by making changes to the building façade design for the Project. In this regard, the Subcontract contains a set of drawings that set forth the design of the Project, including a set of architectural drawings that were the basis for Bunting's metal panel work. Bunting Ex. 283 (Project Architectural Drawings); ECF No. 207 at 70:2-11, 74:6-15 (testimony of Firas Abdelahad regarding his review of the Project Architectural Drawings). Detail 2 of drawing A7.10 shows that Bunting's metal panels were initially to be attached to the building *via* a glazing pocket. Bunting Ex. 283 (Project Architectural Drawings); ECF No. 207 at 77:18-78:7, 80:18-22 (testimony of Firas Abdelahad regarding the glazing pocket design in the Project's Architectural Drawings); ECF No. 209 at 215:15-19, 219:2-20, 223:13-225:5 (testimony of Joshua Bunting regarding A7.10 shop drawing and demonstrative exhibit).

On July 13, 2017, Bunting sent its first shop drawing submittal for its metal panel work (No. 074200_005) to Whiting-Turner, which shows the design intent of the metal panels as designed by the Architect. Bunting Ex. 247 at 2 (Bunting Submittal Log showing July 13, 2017 submission date for Submittal No. 074200_005). Bunting transmitted subsequent drawings to Whiting-Turner on August 2, 2017, August 2, 2017 and August 10, 2017, respectively. *Id.* at 2-3; ECF No. 207 at 80:23-81:3, 87:23-88:7 (testimony of Firas Abdelahad regarding shop drawing submission dates). Bunting argues that it was delayed in fabricating the metal panels for the Project, because it did not receive the Architect's comments to its August 10, 2017, Submittal No. 074200_005c until December 27, 2017, which was four months after the comments were due. ECF No. 212 at 16.

On February 9, 2018, the Architect approved Bunting's submittal, subject to the comments included therein. Bunting Ex. 247 at 4 (Bunting Submittal Log noting Submittal No. 074200_005d is "Approved As Corrected"); ECF No. 207 at 94:13-25 (testimony of Firas Abdelahad regarding when Bunting's final submittal was sent to and approved by Whiting-Turner); Bunting Ex. 286 (Bunting's February 9, 2018, submittal); ECF No. 208 at 177:1-11

(testimony of Cherese Stevens confirming her signature on Bunting's February 9, 2018, Submittal). But, in March 2018, Bunting learned that the building façade design for the Project had changed, because the Architect added metal flashing materials, metal plates, and an additional air barrier (or waterproofing) that were not previously included in the Project design. Bunting Ex. 22 (March 22, 2018, email from John Alvarado to Barkin Guner explaining that the architectural drawings would not be revised); Bunting Ex. 23 (March 28, 2018, email from John Alvarado to Barkin Guner regarding modifications to metal panel details); Bunting Ex. 25 (March 30, 2018, email from Cherese Stevens to Dave Yedlowski advising Bunting of design changes and requesting modifications to shop drawings); ECF No. 207 at 95:1-7, 98:5-24, 100:11-101:14, 102:10-16 (testimony of Firas Abdelahad regarding design modifications); ECF No. 207 at 130:4-131:12, 141:15-23 (testimony of John Alvarado regarding design modifications); ECF No. 208 at 225:11-227:19 (testimony of Joshua Bunting regarding design modifications). And so, Bunting argues that the consequences of the value engineering change for the Project, without a revised design by the Architect, "was multiple submissions of shop drawings by the building façade trades, which resulted in a delay to the approval process." ECF No. 212 at 17; *see* ECF No. 207 at 104:7-9 (testimony of Firas Abdelahad regarding his non-receipt of an official drawing showing the "window head"); ECF No. 207 at 127:9-13, 130:4-131:12, 134:10-135:6, 136:22-137:1, 137:13-24 (testimony of John Alvarado regarding the impact of value engineering design change).

Bunting ultimately engineered a metal bracketing system (a "z-girt"), so that it could fasten its metal panels to the building, because the value engineering change required a window wall system for the building façade, instead of a glazing pocket. ECF No. 208 at 225:19-226:16, 243:5-14 (testimony of Joshua Bunting regarding the effect of value engineering change); ECF No. 207 at 90:5-17, 101:15-24 (testimony of Firas Abdelahad regarding the z-girt addition). But Bunting argues that it could not start its metal panel fabrication until the final design was completed and approved. ECF No. 212 at 17; ECF No. 207 at 104:10-14 (testimony of Firas Abdelahad regarding Bunting's process of fabrication after the final design was completed and approved). And so, Bunting contends that its metal panel work was delayed by 161 days, due to the change in the building façade design for the Project. Bunting Ex. 355 at 15-16 (Supplemental Expert Disclosure of Joshua P. Bunting's Opinions, explaining delay due to the design change and shop drawing issue); ECF No. 209 at 90:23-24, 91:16 (testimony of Joshua Bunting regarding his expert opinion on how many days of delay were caused by the design change and shop drawing issue).

### 2. Missing Studs

Bunting also argues that its work was hindered, because certain studs for the metal framing system for the Project were not timely installed (the "Missing Stud Issue"). ECF No. 212 at 17, 49. In this regard, Bunting alleges that, by February 2018, the framing subcontractor had not installed certain studs for the metal framing system that were needed for Bunting to install its z-girts. Bunting Ex. 15 (February 24, 2018, Non-Conforming Work Notice 0015 regarding the Missing Stud Issue); ECF No. 207 at 210:16-19, 211:7-11, 220:4-7, 221:3-6 (testimony of John Maguire regarding the notification and effect of the Missing Stud Issue). Bunting also alleges that it "was forced to install a piece of metal strapping around the framing so it could finally proceed with the installation of its z-girts." ECF No. 212 at 18; ECF No. 207 at 211:7-11, 220:4-7, 228:17-229:7 (testimony of John Maguire regarding the installation of metal strapping to remedy the Missing Stud Issue).

Given this, Bunting contends that it was prevented from installing its metal panels at all the locations with missing studs. ECF No. 208 at 9:19-25 (testimony of John Maguire regarding installation delays). And so, Bunting contends that the Missing Stud Issue delayed its metal panel work by 328 days. Bunting Ex. 355 at 9-11 (Supplemental Expert Disclosure of Joshua P. Bunting's Opinions, explaining delay due to the Missing Stud Issue); ECF No. 209 at 89:17-22 (testimony of Joshua Bunting regarding his expert opinion on how many days of delay were caused by the Missing Stud Issue).

### 3. Project Site Access And Coordination

Bunting also alleges that Whiting-Turner interfered with its ability to complete work on the Project, due to various issues related to its access to the Project site and coordination with other subcontractors. ECF No. 212 at 19-20. In this regard, the evidence shows that Bunting agreed to install the metal panels for the Project using the "cork screw" method, with some reservations. ECF No. 207 at 203:7-204:7 (testimony of John Maguire regarding "cork screw" method reservations). To do so, Bunting had access to nine swing stages at the Project site. ECF No. 207 at 204:8-22 (testimony of John Maguire regarding Bunting's procurement of and access to swing stages). But Bunting contends that, when swing stages were delivered to the Project site in June 2018, there were materials from other predecessor subcontractors on the Project building's roof that prevented the swing stage supplier from setting up the swing stages as planned. ECF No. 207 at 208:21-210:5 (testimony of John Maguire regarding access issues for

15

the swing stage supplier). Bunting also contends that, once its swing stages were set up, Bunting
discovered that multiple areas within the Project site were not accessible, because predecessor
subcontractors were still performing work in those locations. ECF No. 207 at 213:1-214:6,
214:21-215:5 (testimony of John Maguire regarding predecessor subcontractors' work). And so,
Bunting contends that could not perform its metal panel work in the "cork screw" manner.

### 4. Waterproofing Issues

Bunting also alleges that there were concerns about the Project's waterproofing work that
were not resolved before it mobilized to the Project site, causing a delay of its work. ECF No.
212 at 20-21; Bunting Ex. 317 (May 3, 2018, email chain with John Alvarado, Whiting-Turner
Team and the Owner regarding watertightness issue with the Project building); ECF No. 207 at
158:3-7, 158:15-17, 159:2-160:4, 161:14-162:6 (testimony of John Alvarado discussing concerns
regarding water leaks and watertightness of the Project building before Bunting mobilized to the
Project site). These waterproofing concerns include: (1) Calvert Masonry's failure to install
waterproofing in certain areas; (2) Calvert Masonry's failure to seal gaps in the waterproofing; (3)
pockets of water were being trapped behind the waterproofing installed by Calvert Masonry; and
(4) Calvert Masonry's decision to install waterproofing from inside the Project building by
hanging from a window instead of from a swing stage, which is how waterproofing is typically
installed on high-rise projects. Bunting Ex. 37 (June 28, 2018, email from John Maguire
notifying Whiting-Turner that Bunting "stopped my install because the waterproofing is not ready
to be covered[,]" which included photographs showing the deficient waterproofing); ECF No. 208
at 12:5-24, 15:12-16:15 (testimony of John Maguire regarding waterproofing issues); Bunting Ex.
38 (June 28, 2018, Non-Conforming Work Notice 0005 notifying Whiting-Turner that "Bunting's
installation crew stopped work several times throughout the week because the water proofing was
either incomplete or, was not applied within specified tolerances."); ECF No. 208 at 250:10-
251:17, 252:4-24, 254:3-18 (testimony of Joshua Bunting regarding the June 28, 2018, Non-
Conforming Work Notice 0005); ECF No. 207 at 201:4-22 (testimony of John Maguire regarding
how the predecessor subcontractor installed the waterproofing); ECF No. 208. at 11:5-8
(testimony of John Maguire regarding multiple issues with the waterproofing); Bunting Ex. 40
(June 29, 2018, email from John Maguire to Dave Yedlowski regarding stopping installation of z-
girts because the waterproofing was "too rough").

The waterproofing issues at the Project continued into September and October 2018. Bunting Ex. 101 (September 28, 2018, email from Cherese Stevens to John Maguire and Dave Yedlowski noting waterproofing issues that would need to be fixed before panel installation); ECF No. 208 at 21:7-23; 22:3-4, 22:10-23:3, 24:2-10 (testimony of John Maguire regarding air barrier deficiencies); Bunting Ex. 98 (September 28, 2018, Non-Conforming Work Notice 0019 regarding the north elevation waterproofing issue); ECF No. 209 at 44:4-45:2 (testimony of J. Bunting regarding Non-Conforming Work Notice 0019); Bunting Ex. 105 (October 8, 2018, email from John Maguire to Joshua Bunting and Dave Yedlowski regarding the Project building's waterproofing test failures); ECF No. 208 at 24:18-26:18 (testimony of John Maguire regarding the Project building's waterproofing test failures).  And so, on October 29, 2018, Whiting-Turner requested that Bunting start removing the metal panels that had been installed, so that Whiting-Turner could investigate waterproofing issues.  Bunting Ex. 121 (October 29, 2018, email from Joshua Bunting to Barkin Guner regarding the removal of Bunting's panels to investigate waterproofing issues); ECF No. 209 at 47:19-48:12 (testimony of Joshua Bunting regarding the October 29, 2018, email).[4]

Bunting contends that the waterproofing issues continued into late December 2018 and continued to impact its work.  Bunting Ex. 151 (December 21, 2018, email chain between John Maguire and Joshua Bunting regarding stopping work on west elevation due to the waterproofing issues); ECF No. 208 at 27:6-29:16 (testimony of John Maguire regarding correspondence about stopping work on west elevation); ECF No. 209 at 49:9-50:2 (testimony of Joshua Bunting regarding how the directive to stop work on the west elevation so that "Blueskin" could be installed and sealed was a change in the installation procedure).  And so, on January 8, 2019, Bunting sent Whiting-Turner a "Schedule Impact Notice & Warranty Impact" letter stating that

---

[4] On October 31, 2018, Bunting submitted a Waterproofing Impact Analysis to Whiting-Turner, which provides "an assessment of the delays, disruptions, and labor inefficiencies caused by the poor quality of the workmanship of the waterproofing installation."  Bunting Ex. 123 (October 31, 2018, Waterproofing Impact Analysis).  Bunting asserts, among other things, that: (1) the waterproofing was incomplete; (2) the waterproofing subcontractor commandeered Bunting's swing stages; and (3) Whiting-Turner did not perform quality inspections prior to Bunting's mobilization.  *Id.*; ECF No. 211 at 111:25-112:2, 114:16-115:12, 117:6-118:7 (testimony of Joshua Bunting regarding drafting and content of the waterproofing impact analysis); Bunting Ex. 124 (October 31, 2018, email from Joshua Bunting to Whiting-Turner's team regarding deficiencies in waterproofing); ECF No. 209 at 45:17-47:18 (testimony of Joshua Bunting regarding the October 31, 2018, email to the Whiting-Turner's team).

"Whiting-Turner has taken over all of Bunting's Scaffolding Equipment and is preventing Bunting from working on these elevations until the work is complete."  Bunting Ex. 164 (January 8, 2019, Schedule Impact Notice & Warranty Impact Letter).  Bunting contends that the waterproofing issues delayed its metal panel work by 424 days.  Bunting Ex. 355 at 12-16 (Supplemental Expert Disclosure of Joshua P. Bunting's Opinions, explaining delay due to the waterproofing issues); ECF No. 209 at 89:23-24:10 (testimony of Joshua Bunting regarding his expert opinion on how many days of delay were caused by the waterproofing issues).

### 5.   The Dimensional Bust And Perforated Metal Screens

Lastly, Bunting alleges that an issue with improper control line installation delayed its perforated metal screen and metal panel work on the Project (the "Dimensional Bust Issue").  In this regard, Bunting maintains that Whiting-Turner installed the east-west control line for the Project building one inch off at both the east and west elevations, creating a "dimensional bust." ECF No. 208 at 32:10- 33:2, 33:23-25 (testimony of John Maguire regarding the effect of Dimensional Bust Issue).  On August 9, 2018, and September 19, 2018, Bunting notified Whiting-Turner of this concern and that it could not install the metal panels until the matter was remedied.  Bunting Ex. 64 (August 9, 2018, Non-Conforming Work Notice 0012 notifying of the Dimensional Bust Issue); Bunting Ex. 90 (September 24, 2018, Non-Conforming Work Notice 0018 notifying of Dimensional Bust Issue); ECF No. 209 at 23:10-18, 24:6- 25:1 (testimony of Joshua Bunting regarding Non-Conforming Work Notice 0012).  Bunting contends that the Dimensional Bust Issue prevented it from installing its metal panels in the "cork screw" manner and impacted its overall metal panel work.  ECF No. 209 at 26:19-27:7 (testimony of Joshua Bunting regarding impact of the Dimensional Bust Issue).

Bunting also maintains that it could not start fabricating the perforated metal screens, until it received direction from Whiting-Turner about the location of the perforated metal screens and its revised design was completed and approved.  Bunting Ex. 71 (August 20, 2018, email from Barkin Guner to Joshua Bunting regarding the revised design for the location of the perforated metal screens); ECF No. 209 at 28:16-29:9 (testimony of Joshua Bunting regarding the August 20, 2018, email from Barkin Guner).  Bunting ultimately installed the perforated metal screens in late October or early November.  ECF No. 208 at 212:14-19 (testimony of Joshua Bunting regarding the perforated metal screen installation).  Bunting contends that the Dimensional Bust Issue delayed its work by 297 days.  Bunting Ex. 355 at 5-7 (Supplemental Expert Disclosure of

Joshua P. Bunting's Opinions, explaining delay due to the Dimensional Bust Issue); ECF No. 209 at 88:14-89:5 (testimony of Joshua Bunting regarding his expert opinion on how many days of delay were caused by the Dimensional Bust Issue).

<u>Bunting's Payment Claims</u>

### 1. Payment Application No. 15

Bunting also alleges that Whiting-Turner breached the Subcontract by failing to pay several of its Payment Applications. ECF No. 212 at 37-39. With regards to this claim, the evidence shows that, on November 21, 2018, Bunting submitted Payment Application No. 15, which requests payment in the amount of $202,249.35, for work that Bunting completed in November 2018. Bunting Ex. 134 (Payment Application No. 15, for the period ending November 30, 2018). Bunting later revised Payment Application No. 15 to request $198,000, after Whiting-Turner questioned the extent of metal panel fabrication progress stated in the original payment application. Bunting Ex. 207 (Revised Payment Application No. 15, for the period ending November 30, 2018); ECF No. 209 at 65:22-66:9, 66:24-67:10 (testimony of Joshua Bunting regarding Payment Application No. 15). It is undisputed that Whiting-Turner has not paid Payment Application No. 15. *Id.*

### 2. Payment Application No. 16

On February 1, 2019, Bunting submitted Payment Application No. 16, which requests payment in the amount of $206,286.75, for work that Bunting completed in December 2018. Bunting Ex. 189 (Payment Application No. 16, for the period ending December 31, 2018); ECF No. 209 at 67:13-21 (testimony of Joshua Bunting regarding Payment Application No. 16). It is undisputed that Whiting-Turner has not paid Payment Application No. 16. ECF No. 209 at 67:17-24 (testimony of Joshua Bunting regarding Payment Application No. 16).

### 3. Payment Application No. 17

On January 18, 2019, Bunting submitted Payment Application No. 17, which requests payment in the amount of $134,355.91, for work that Bunting completed in January 2019. Bunting Ex. 177 (Payment Application No. 17, for the period ending January 31, 2019); ECF No. 209 at 67:25-68:6 (testimony of Joshua Bunting regarding Payment Application No. 17). It is undisputed that Whiting-Turner has not paid Payment Application 17. ECF No. 209 at 68:7-9 (testimony of Joshua Bunting regarding Payment Application No. 17).

Bunting's Change Order Requests

Lastly, Bunting alleges that Whiting-Turner breached the Subcontract by changing the scope of its work and hindering its work, as reflected in several of its Change Order Requests ("CORs").[5] ECF No. 212 at 39-41. With regards to this claim, the evidence shows that Bunting submitted COR 19 in October 16, 2018, and that this COR seeks $4,224.15 for additional work involving the removal and reinstallation of certain metal panels, to allow Whiting-Turner to perform testing on deficient waterproofing. Bunting Ex. 109 (COR 19); ECF No. 208 at 246:13-247:4, 247:13-248:25 (testimony of Joshua Bunting regarding COR 19). On December 28, 2018, Bunting submitted COR 21, seeking $2,574.60, because "Whiting-Turner took over all of Bunting's swing stages so Alliance Glazing, another Whiting-Turner subcontractor, could install Blueskin over the flashing as part of the waterproofing process." Bunting Ex. 155 (COR 21); ECF No. 209 at 81:3-19 (testimony of Joshua Bunting regarding COR 21).

On February 25, 2019, Bunting submitted COR 25, which seeks $39,564.04 for providing approximately 1,500 linear feet of metal flashing at the door jambs. Bunting Ex. 203 (COR 25); ECF No. 209 at 80:17-81:2 (testimony of Joshua Bunting regarding COR 25). On February 28, 2019, Bunting submitted COR 27, which seeks $21,797.20 for Bunting's work to prepare an alternate design for the grilles to be installed at the Project. Bunting Ex. 204 (COR 27); ECF No. 209 at 77:25-78:9 (testimony of Joshua Bunting regarding COR 27).

On April 9, 2019, Bunting submitted COR 30, which seeks $5,835.76 for differing site conditions in the areas where the louvers were to be installed. Bunting Ex. 237 (COR 30); ECF No. 209 at 76:25-77:23 (testimony of Joshua Bunting regarding COR 30). On April 9, 2019, Bunting submitted COR 31, seeking $38,319.38 due to differing site conditions in the areas where the metal panels were to be installed at the ground level retail areas. Bunting Ex. 236 (COR 31); ECF No. 209 at 80:9-16 (testimony of Joshua Bunting regarding COR 31).

Lastly, on April 9, 2019, Bunting submitted COR 32, which seeks $65,933.85 for additional costs incurred by Bunting to modify the metal panels to be installed at the penthouse

---

[5] On March 3, 2022, the Court granted-in-part and denied-in-part Whiting-Turner's motion for partial summary judgment, dated January 13, 2021, and dismissed: (1) Bunting's claims based upon CORs 5, 7-9, 11, 13-15, 17, 20, 23 and 28, upon the basis of waiver and (2) Bunting's claims based upon CORs 9-2, 19-2 and 24, upon the ground of untimeliness. ECF No. 83.

level and the increased material costs for this work.  Bunting Ex. 237 (COR 32); ECF No. 209 at 78:10-79:17, 80:2-5 (testimony of Joshua Bunting regarding COR 32).

    **B. Witnesses**

The Court held a trial on the parties' claims and counterclaims from March 18, 2024, to March 22, 2024.  ECF Nos. 188, 189, 195, 197 and 199.  During the trial, Bunting presented the following fact witnesses: Firas Abdelahad; John Antonio Alvarado; John Edward Maguire, Gary Shafer and Cherese Stevens.  A summary of the witnesses' testimony follows:

Firas Abdelahad: Mr. Abdelahad testified that he served as Bunting's Director of Engineering for the Project.  ECF No. 207 at 60 (trial testimony of Firas Abdelahad).  In this regard, Mr. Abdelahad testified that there was a change in Bunting's scope of work for the window system for the Project, and that, as a result, Bunting had to revise its shop drawings and its engineering.  *Id*.  And so, Mr. Abdelahad testified that the change to the window system for the Project prevented Bunting from starting fabrication of the metal panels.  *Id*.

John Antonio Alvarado: Mr. Alvarado testified that he was the Project architect's Construction Administrator when he was involved with the Project. ECF No. 207 at 120 (trial testimony of John Alvarado).  Mr. Alvarado also testified that a window wall system became part of the Project during construction.  *Id*. at 126.  Mr. Alvarado also testified that he had concerns about water ingress in the Project building.  *Id.* at 162.

John Edward Maguire: Mr. Maguire testified that he was Bunting's Field Superintendent for the Project and that he worked on the Project from the Spring 2018 to Spring 2019.  ECF No. 207 at 192 (trial testimony of John Maguire).  Mr. Maguire also testified that Whiting-Turner did not properly coordinate the building façade work for the Project.  ECF No. 207 at 199-200.  In this regard, Mr. Maguire testified that: (1) there were areas of the Project building that were not ready when Bunting arrived at the Project site; (2) waterproofing work had not been completed; (3) bricklaying work was being performed above Bunting's work area; and (4) Bunting's swing stage supplier could not access the Project building's roof.  *Id*. at 207-209.  Mr. Maguire further testified that Bunting could not work due to the incomplete work of predecessor subcontractors.  *Id*. at 214-15.  Lastly, Mr. Maguire testified that Bunting's work was also delayed due to, among other things, the Missing Stud Issue, waterproofing issues and the Dimensional Bust Issue.  ECF No. 208 at 30.

<u>Gary Shafer</u>: Mr. Shafer testified that he was Whiting-Turner's project manager and façade manager for the Project. ECF No. 208 at 97 (trial testimony of Gary Shafer). Mr. Shafer also testified that he issued the September 2019 Default Notice to Bunting and the January 2019 Supplementation Letter to Bunting. *Id*. at 103-04. In this regard Mr. Shafer testified that Bunting was required to be at the Project site by May 15, 2018, and that Bunting's mobilization was slow. *Id*. at 130-132. And so, Mr. Shafer testified that Bunting's failure to mobilize to the Project site delayed the installation of the metal panels. *Id*.

<u>Cherese Stevens</u>: Ms. Stevens testified that she was the project engineer for the Project. ECF No. 208 at 159 (trial testimony of Cherese Stevens). Ms. Stevens testified that the Missing Stud Issue affected Bunting's ability to install the metal panels, but that other areas of the building were available for Bunting to install metal panels. *Id*. at 179. Lastly, Ms. Stevens testified that the Missing Stud Issue was resolved in one to two weeks. *Id*. at 180.

During the trial, Bunting presented the following expert witness and his testimony is summarized below:

<u>Joshua Bunting</u>: Mr. Bunting is the President of Bunting and he was designated as a fact and expert witness on certain topics during the trial, including: (1) the fabrication, the assembly and the installation of metal panels, perforated metal screens and louvers/grilles on a building façade for construction projects; (2) the coordination, sequence and interrelation of work performed by other building façade subcontractors; (3) construction/project management and quality control regarding building façade construction work; and (4) construction schedules and sequencing of building façade construction work. *See* ECF No. 130-2; Bunting Ex. 355; *see also* ECF No. 208 at 184-209; ECF No. 209 at 18-162 (trial testimony of Joshua Bunting). Mr. Bunting testified that:

- Whiting-Turner failed to properly plan, manage, coordinate and perform its obligations as required by the Subcontract;

- Whiting-Turner failed to ensure that its building façade subcontractors performed their scopes of work in a timely and/or proper manner;

- The work installed and/or performed by Whiting-Turner's building façade subcontractors included defects and/or deficiencies with the framing, waterproofing, precast concrete panel and window work on the Project, resulting in cost and schedule impacts to Bunting; and

- Whiting-Turner failed to perform proper quality control of the Project's building façade work and failed to adequately supervise its building façade subcontractors.

*See* ECF No. 208 at 184-209; ECF No. 209 at 18-162.

In addition, Mr. Bunting testified that:

- Whiting-Turner failed to properly maintain the Project schedule and coordinate the Project's building envelope work by departing from the planned sequence set forth in the Project schedules and failing to ensure timely completion of the other building envelope work to be installed ahead of Bunting's metal panel work (i.e., predecessor work);

- The multiple design changes to the perforated panels provided by Whiting-Turner after Subcontract execution significantly interfered with and delayed Bunting's manufacturing and installation of the perforated metal screens;

- Bunting's Subcontract scope of work did not include the supply and installation of metal panels to the left and right sides of the doors and beneath the windows on the balconies at the inner courtyard at the south elevation of the Project, and Whiting-Turner failed to reasonably cooperate and coordinate this work with by not following the proper sequence and not issuing to Bunting a "Disputed Change Request Authorization;"

- Bunting's Subcontract scope of work did not include the supply and installation of shoe base covers for the glass railing system at the unit balconies, and Whiting-Turner failed to reasonably cooperate and coordinate this work with Bunting by not following the proper sequence and not issuing to Bunting a "Disputed Change Request Authorization;"

- Whiting-Turner's lack of diligence to resolve the deficient work significantly delayed, hindered and impacted Bunting's metal panel installation;

- Whiting-Turner's lack of diligence to resolve deficient work installed by Whiting-Turner's precast concrete subcontractor at the east and west elevations of the Project hindered, delayed and interfered with Bunting's metal panel installation at the same locations;

- Whiting-Turner's failure to, and lack of diligence to, resolve the deficient work significantly delayed, hindered and impacted Bunting's metal panel installation;

- After Subcontract execution, the Project's design for the building envelope continually changed, resulting in Bunting having to submit multiple iterations of its metal panel shop drawings and Bunting's fabrication and installation of its metal panels was significantly delayed; and

- Design conflicts and incomplete predecessor work prevented Bunting from installing its metal panels at the ground level, retail areas and the penthouse level.

*See* ECF No. 208 at 184-209; ECF No. 209 at 18-162.

During the trial, Whiting-Turner presented the following witnesses: Barkin Guner, Franklin Perez, Eric Christian Krahe, Daniel Scott Ramsey and Laura Murphy and their testimony is summarized below:

Barkin Guner: Mr. Guner testified that he was Whiting-Turner's senior project manager for the Project. ECF No. 209 at 163 (trial testimony of Barkin Guner). Mr. Guner also testified that he discussed value engineering changes to the Project window wall system with Bunting. *Id.* at 168-169. Mr. Guner testified that metal panel installation should have been at least 80% complete by September 2018, but Bunting had only completed the installation of approximately 20% of the panels by September 2018. *Id.* at 194-195. Mr. Guner also testified that only 30% of the panel installation was complete by January 15, 2019. *Id.* at 206. Lastly, Mr. Guner testified that Whiting-Turner supplemented Bunting's workforce in January 2019, because the metal panel installation had not progressed. *Id.* at 208-09.

Franklin Perez: Mr. Perez testified that he is the President of Bolimex, a company that provides rainscreen installation. ECF No. 210 at 13-58 (trial testimony of Franklin Perez). He also testified that Bolimex became involved with the Project in 2019 to complete the installation of the metal panels. *Id.* at 17-19. In this regard, Mr. Perez testified that Bolimex was able to access work areas and there were no coordination issues regarding the Project's building façade work. *Id.* at 19-24. But, there were not enough panels to complete panel installation. *Id.* at 28-29. Lastly, Mr. Perez testified that water testing showed that Bunting screwed through the "Blueskin" or waterproofing during its prior panel installation. *Id.* at 37.

Eric Christian Krahe: Mr. Krahe testified that he was Whiting-Turner's project manager for the Project beginning in September 2018 and that he oversaw the exterior subcontractors. ECF No. 210 at 171-173 (trial testimony of Eric Krahe). Mr. Krahe testified that he investigated the waterproofing issues at the Project and that Whiting-Turner needed to remove metal panels previously installed by Bunting to investigate waterproofing caused by screwing through the Blueskin. *Id.* at 180. Mr. Krahe also testified that, by January 15, 2019, the installation of metal panels was approximately 23% complete and that there were 900 panels left to fabricate. *Id.* at 186. Lastly, Mr. Krahe testified that the installation of the metal panels was approximately 27% complete by March 11, 2019. *Id.* at 193-94.

Daniel Scott Ramsey: Mr. Ramsey testified that he is Whiting-Turner's Division Vice President and that he was involved with the Project beginning in the Fall of 2018. ECF No. 211 at 7-10. Mr. Ramsey testified that he was aware of issues with Bunting's work on the Project and that the metal panel installation should have been completed by March 2019. *Id.* at 17.

<u>Laura Murphy</u>: Ms. Murphy testified that she is a senior claims counsel for Travelers. ECF No. 211 at 49 (trial testimony of Laura Murphy). Ms. Murphy testified that she considered the September 2018 Default Notice to have been withdrawn by Whiting-Turner. *Id*. at 50. Ms. Murphy also testified that Travelers Performance Bond for the Project has a limit in the amount of $2,652,500.00. *Id*. at 66.

During the trial, Whiting-Turner presented the following expert witnesses and their testimony is summarized below:

<u>Paul Brough</u>: Mr. Brough is a construction scheduling expert and he offered the following opinions during the trial:

- Bunting was significantly behind schedule for the installation of the metal panels based on the Project Schedule when the notice of default was issued by Whiting-Turner to Bunting on September 12, 2018. At that time, the predecessor work to the installation of the metal panels was on schedule and did not delay Bunting's installation of the metal panels. Bunting was significantly behind schedule as to the installation of the metal panels on September 12, 2018, because Bunting failed to progress this work.

- Between September 12, 2018, and January 15, 2019, Bunting's installation of the metal panels continued to be significantly behind the Project Schedule for this work. The predecessor activities for Bunting's work remained on schedule and did not delay Bunting's installation of the metal panels and perforated metal screens. Bunting remained behind schedule because of Bunting's failure to progress this work.

*See* ECF No. 210 at 117-170.

<u>Brian Kent</u>: Mr. Kent is a construction management expert and he offered the following opinions during the trial:

- Bunting failed to follow the "corkscrew" method – a level-by-level spiral approach – for the performance of its work as part of the construction of the exterior skin of the building, contrary to the requirements for the Project and standard industry practices, thereby causing Bunting's work to be inefficient and delayed.

- During the performance of its work, Bunting always had areas available to progress its work and the ability of Bunting to progress its work was not impacted by the work of predecessor subcontractors or quality control testing, including testing and repair of the waterproofing for the exterior of the building.

- Bunting's failure to follow the corkscrew method and to properly manage its work and timely provide materials necessary for its work resulted in Bunting's work falling significantly behind the Project schedule.

*See* ECF No. 210 at 60-116.[6]

### D.    Relevant Procedural History

The Court held a five-day trial in this matter from March 18, 2024, to March 22, 2024. ECF Nos. 188, 189, 195, 197 and 199.  On June 20, 2024, Bunting, Whiting-Turner and Travelers filed their respective opening post-trial briefs.  ECF Nos. 212, 213 and 214.  On July 24, 2024, Bunting, Whiting-Turner and Travelers filed their respective responsive post-trial briefs.  ECF Nos. 220, 221 and 222.

The Court heard closing arguments on December 18, 2024.  ECF No. 233.  On December 20, 2024, the parties filed their respective lists of alleged material breaches of the Subcontract. ECF Nos. 236 and 238.

## III.    STANDARDS OF DECISION

### A.    Breach Of Contract Claims And Prior Material Breach

Under Maryland law, the elements of a breach of contract claim are (1) a contractual obligation and (2) a material breach of that obligation.  *Allstate Ins. Co. v. Warns*, No. 11-1846, 2012 WL 681792, at *10 (D. Md. Feb. 29, 2012) (citing *Taylor v. NationsBank*, *N.A.*, 365 Md. 166, 174, 776 A.2d 645, 561 (Md. 2001)).  "To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation."  *RRC Ne., LLC v. BAA Maryland, Inc.*, 413 Md. 638, 658, 994 A.2d 430, 442 (Md. 2010) (quoting *Taylor v. NationsBank, N.A.*, 365 Md. 166, 174, 776 A.2d 645, 561 (Md. 2001)).  "A breach is material 'if it affects the purpose of the contract in an important or

---

[6] The following exhibits were admitted during the trial:  Joint Exs. 1-10; Bunting Exs. 10.1, 10.2, 12, 13, 15, 16, 19, 21, 22, 23, 25, 37, 38, 39, 40, 41, 43, 45, 47, 51, 63, 64, 69, 71, 74, 80, 85, 90, 92, 97, 98, 101, 105, 108, 109, 121, 123, 124, 134, 137, 151, 152, 155, 157, 158, 162, 164, 169, 173, 177, 179, 187, 189, 194, 203, 204, 207, 208, 218, 227, 229, 231, 234, 235, 236, 237, 243, 247, 250, 283, 286, 288, 296, 298, 317, 337, 338, 340, 341, 349, 355, 363, 369, 372, 381, 388, 405, 406, 412 and 413; Whiting-Turner Exs. 12, 13, 41, 42, 43, 44, 45, 54, 57, 65, 82, 84, 86, 88, 89, 90, 103, 104, 105, 109, 113, 116, 117, 127, 128, 212, 214, 215, 219, 221, 222, 223 H, 223 I, 223 L, 223 M, 223 O, 223 P, 223 T, 223 U, 223 W, 223 AA, 251, 252 and 253; and Travelers Exs. 1, 2, 4, 6, 8, 9, 15, 24, 32, 37, 40 and 41.  ECF Nos. 200, 201, 202 and 203.

vital way.'"  *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 260 (4th Cir. 2005) (quoting *Sachs v. Regal Sav. Bank, FSB*, 705 A.2d 1, 4 (Md. Ct. Spec. App. 1999)).

The Fourth Circuit has held that "a material breach by one party to a contract excuses the other party from performance."  *Final Analysis Commc'n Servs., Inc. v. Gen. Dynamics Corp.*, 253 F. App'x. 307, 313 (4th Cir. 2007) (citing *Rogers Refrigeration Co., Inc. v. Pulliam's Garage, Inc.*, 66 Md. App. 675, 684-85, 505 A.2d 878, 883 (1986); *Fromm Sales Co. v. Troy Sunshade Co.*, 222 Md. 229, 233, 159 A.2d 860, 863 (1960).  Given this, a party who materially breaches a contract cannot recover damages for the other party's subsequent nonperformance, as the latter party's performance is excused.  *Jay Dee/Mole J.V. v. Mayor and City Council of Baltimore*, 725 F. Supp. 2d 513, 528 (D. Md. 2010); *Bollech v. Charles County*, 166 F. Supp. 2d 443, 458 (D. Md. 2001) ("Failure of performance by one party suspends the duty of the other party to perform.") (internal citations omitted).

### B.  Breach Of Implied Duties And The Prevention Doctrine

This Court has held, within the context of a construction contract, that the duty of a general contractor "is essentially that of reasonable cooperation and support in assisting the subcontractor in the completion of its portion of the work . . . [and] includes the duty to properly schedule and coordinate the work of subcontractors."  *Bat Masonry Co. v. Pike-Paschen Joint Venture III*, 842 F. Supp. 174, 178 (D. Md. 1993).  Maryland courts have also recognized that a general contractor has an implied obligation "not to hinder, delay, or interfere with the work of the subcontractor[.]"  *Id.*; *see also Cont'l Masonry v. Verdel Constr. Co.*, 279 Md. 476, 477 n.1, 369 A.2d 567 n.1 (Md. 1977) ("[I]t appears fairly well settled that a general contractor is under an implied obligation not to delay or hinder, by his own actions, performance by a subcontractor.").  In addition, "Maryland contract law generally implies an obligation to act in good faith and deal fairly with the other party or parties to a contract."  *Questar Builders, Inc. v. CB Leveling, LLC*, 410 Md. 241, 273, 978 A.2d 651, 670 (Md. 2009) (citing *Clancy v. King*, 405 Md. 541, 565-66, 954 A.2d 1092, 1106 (Md. 2008)).

The prevention doctrine is a common law and equitable doctrine that provides that a contracting party should not do anything that prevents the other party from performing its contractual obligation.  *Parkway 1046, LLC v. U. S. Home Corp.*, 961 F.3d 301, 310 (4th Cir. 2020) (internal citations omitted).  And so, "the prevention doctrine is a mechanism to excuse the nonperformance of one party when the other fails to perform."  *Id.* (internal citations omitted).

In this regard, the Fourth Circuit has held that: "if one party to a contract 'hinders, prevents or makes impossible performance by the other party, the latter's failure to perform will be excused.' In other words, the prevention doctrine applies when one party prevents another party from performing under the contract." *Id.* (quoting *WSC/2005 LLC v. Trio Ventures Assocs.*, 460 Md. 244, 268, 190 A.3d 255, 267 (2018) (internal citations omitted)); *see also Yacoubou v. Wells Fargo Bank, N.A.*, 901 F. Supp. 2d 623, 629 (D. Md. 2012) (internal citation omitted); *State Dept. of Gen. Servs. v. Cherry Hill Sand & Gravel Co.*, 51 Md. App. 299, 310, 443 A.2d 628, 634 (1982). And so, the prevention doctrine prohibits a party from benefitting from the failure of a condition precedent that it caused. *See, e.g., Moore Bros. Co. v. Brown & Root, Inc.*, 207 F.3d 717, 724-26 (4th Cir. 2000) (general contractor's conduct in hindering fulfillment of "pay when paid" condition precedent in subcontracts waived performance of condition precedent, pursuant to prevention doctrine); *see also Young Elec. Contractors v. Dustin Constr.*, 459 Md. 356, 390 n.22, 185 A.3d 170, 190 n.22 (Md. 2018).

### C. Waiver

Under Maryland law, when a party continues to accept performance after an alleged breach, then the accepting party waives its right to terminate the contract, or to deny the continued performance. *See John B. Robeson Assocs., Inc. v. Gardens of Faith, Inc.*, 226 Md. 215, 222-23; 172 A.2d 529, 533 (Md. 1961) (holding that appellee's knowledge of appellant's alleged defaults and acceptance thereafter of further performance barred appellee's right to terminate the contract based on those defaults). And so, if a party claims that the other has defaulted in its performance, but, nonetheless, continues to accept performance, that party cannot later terminate the other party for the alleged default it did not act upon. *Hovnanian Land Inv. Grp., LLC v. Annapolis Towne Centre at Parole, LLC*, 421 Md. 94, 127, 25 A.3d 967, 986 (Md. 2011) (holding that "Hovnanian's continued . . . silence regarding the alleged breach of [the contract provision] for six months . . . coupled with actions indicating it considered the [provision] fulfilled, constituted a modification or waiver of that condition"); *see also Pumphrey v. Pelton*, 250 Md. 662, 670-71, 245 A.2d 301, 306 (Md. 1968) (holding that the knowledge and acceptance of a continuous breach constituted a "continuing waiver" of the breach, making the subsequent termination unreasonable).

### D.  Surety Law

Lastly, the Appellate Court of Maryland has explained that:

> A surety bond is a contract and is to be construed as such.  The bond must be construed in accordance with traditional rules of objective contract interpretation, meaning the clear and unambiguous language of the bond is controlling. It follows that the liability of a surety is not to be extended, by implication, beyond the terms of [its] contract. Where the contract incorporates as a part of itself the specifications, and the contract is, by reference, incorporated as a part of the bond, the contract, the specifications, and the bond must all be construed together.

*Wildewood Operating Co. v. WRV Holdings,* 259 Md. App. 464, 477-78, 303 A.3d 1273, 1281 (Md. App. 2023) (internal citations omitted); *see also Inst. of Mission Helpers of Baltimore City v. Reliance Ins. Co.,* 812 F. Supp. 72, 74 (D. Md. 1992) (holding that "[t]he traditional rules of contract interpretation determine the liability of surety").  Generally, a surety may rely upon the defenses of its bond principal.  *See* Restatement (Third) of Suretyship and Guaranty, § 34(1).  And so, if the principal is not liable to the to the to the obligee, the surety has no liability.  *President & Directors of Georgetown Coll. v. Madden*, 505 F. Supp. 557, 590 (D. Md. 1980), *aff'd in part*, *appeal dismissed in part*, 660 F.2d 91 (4th Cir. 1981) ("If an obligee has no cause of action against the principal, then neither the surety nor the principal will be liable to the obligee.").

## IV.    CONCLUSIONS OF LAW

### A.  The Court Will Consider Evidence
###      Regarding Bunting's Change Order Requests

As a preliminary matter, the Court will not exclude evidence regarding certain Change Order Requests ("CORs") that Bunting submitted to Whiting-Turner during the Project, in considering Bunting's affirmative defenses in this matter.  Bunting brings claims and asserts affirmative defenses in this matter related to several CORs, namely: CORs 5, 7, 8, 9, 11, 13, 14, 15, 17, 19, 20, 23, 25, 27, 28, 30, 31 and 32.  *See* ECF Nos. 1, 83, 212.  As the Court has previously held, many of Bunting's claims based upon these CORs have been waived, or are untimely.  *See* ECF No. 83.  And so, Bunting cannot pursue these claims in this litigation.

But Whiting-Turner argues without persuasion that the Court should exclude evidence related to Bunting's untimely and waived CORs for all purposes.  ECF No. 213 at 18-20.  As several courts have recognized, the dismissal of affirmative claims does not necessarily preclude a

party from relying upon the underlying facts for such claims in supporting its defenses and alternative claims. *See, e.g.*, *United States ex rel. S.H. Anthony v. Sauer, Inc.*, 2017 U.S. Dist. LEXIS 6144 (S.D. Miss., Jan. 17, 2017) (holding that the court would not preclude a contractor from introducing evidence regarding the factual circumstances surrounding certain change order requests that the court had dismissed, because such evidence was relevant to the case.); *see also Alston v. Jones*, 2022 U.S. Dist. LEXIS 81413 at *7 (M.D.N.C., May 5, 2022) ("The Court will preclude all counsel and witnesses from referring to claims that have been dismissed, though not necessarily to the underlying facts, if they are otherwise relevant and raise no Fed. R. Evid. 403 concerns."); *Caizza v. Marceno*, 2020 U.S. Dist. LEXIS 232214 at *3 (M.D. Fla., Dec. 10, 2020 ("[T]he Court notes dismissed and active clams may share underlying facts. In that situation, perhaps 'the underlying facts themselves may be admissible' as relevant on issues submitted to the jury.") (internal citation omitted). And so, courts in the Fourth Circuit have allowed a party to introduce and to refer to evidence regarding affirmative claims that have been dismissed, if this evidence is otherwise relevant. *Alston v. Jones*, 2022 U.S. Dist. LEXIS 81413 at *7 (M.D.N.C., May 5, 2022).

In this case, Bunting relies upon the aforementioned CORs to support its affirmative defenses. *See generally* ECF Nos. 212 and 220. The Court generally agrees with Bunting and Travelers that the dismissal of Bunting's claims based upon these CORs does not necessarily preclude Bunting from relying upon this evidence to support its affirmative defenses, provided that this evidence is relevant to those defenses. ECF No. 220 at 29-34; ECF No. 221 at 3-6. And so, to the extent that it is relevant, the Court will consider evidence related to Bunting's CORs in connection with Bunting's affirmative defenses.[7]

### B. Bunting Materially Breached The Subcontract

Turning to the merits of the parties' contractual dispute, the evidence before the Court shows that Bunting breached the Subcontract in several ways in 2018. As a result, the Court **CONCLUDES** that Bunting is liable to Whiting-Turner for these material breaches.

---

[7] The Court will not, however, consider this evidence in connection with Bunting's prior material breach defense, because the Court has already determined that Bunting cannot rely upon its untimely and waived CORs claims to show that Whiting-Turner breached the Subcontract. *See* ECF No. 83.

### 1. Bunting Materially Breached The Subcontract
### By Failing To Timely Mobilize To The Project Site

First, the evidence shows that Bunting materially breached the Subcontract in May 2018, by failing to timely mobilize to the Project site.  To prevail on their respective breach of contract claims and counterclaims, Bunting and Whiting-Turner must prove that the other owed it a contractual obligation and materially breached that obligation.  *RRC Ne., LLC v. BAA Maryland, Inc.*, 994 A.2d 430, 442 (Md. 2010) (quoting *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001)).  In this regard, the Fourth Circuit has held that "[a] breach is material 'if it affects the purpose of the contract in an important or vital way.'" *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 260 (4th Cir. 2005) (quoting *Sachs v. Regal Sav. Bank, FSB*, 705 A.2d 1, 4 (Md. Ct. Spec. App. 1999)).  Relevant here, Article 4(a) of the Subcontract provides that Bunting agreed to "commence, pursue diligently and complete the work [for the Project] in such sequence and order and according to such schedules as [Whiting-Turner] shall establish from time to time during the course of the work, and [to] perform the work so as not to delay any other trades or contractors, time being of the essence of this Subcontract."  Joint Ex. 1 at WHITINGTURNER008283 (Subcontract at Art. 4(a)).

The evidence shows that the May 1, 2018, Project Schedule Update for the Project provides that Bunting was to mobilize to the Project site and begin the installation of the metal panels on May 15, 2018.  ECF No. 237-1 at 7 (May 1, 2018, Project Schedule Update); *see also* Whiting-Turner Ex. 42 (June 1, 2018, Letter from Gary Shafer to Bunting regarding Bunting's obligation to mobilize in May 2018); Whiting-Turner Ex. 252 at Ex. A (Expert Report of Paul Brough at Ex. A, the "April 1, 2018, Project Schedule Analysis," projecting a May 29, 2018, date for Bunting to mobilize and commence installation).  But the undisputed evidence also shows that Bunting failed to do so, in violation of the Subcontract.

As Bunting acknowledges, the evidence shows that Bunting mobilized to the Project site on or about June 18, 2018, which was several weeks after the mobilization date called for under the Subcontract and the relevant Project Schedule Updates.  Bunting Ex. 355 at 13 (Supplemental Expert Disclosure of Joshua P. Bunting's Opinions, stating "on or about June 18, 2018, BAM mobilized to the Project site"); *see also* Whiting-Turner Ex. 41 (May 30, 2018, email from Barkin Guner to Bunting inquiring about when would Bunting would mobilize to the Project site); *see also* ECF No. 209 at 174:11-178:21 (testimony of Barkin Guner regarding the May 30, 2018,

31

email exchange); Whiting-Turner Ex. 42 (June 1, 2018, Letter from Gary Shafer to Bunting stating that Bunting was scheduled to be on site according to the May 1, 2018, Project Schedule Update, in accordance with the Subcontract).  Given this, there can be no dispute that Bunting failed to timely mobilize to the Project site in May 2018.[8]

As Whiting-Turner explained during the trial, Bunting's timely mobilization to the Project site was necessary, so that Bunting could timely coordinate with the other subcontractors working on the building envelope and arrange for swing stages to commence its own work.  ECF No. 238 at 9; *see also* ECF No. 209 at 178:5-10 (testimony of Barkin Guner) ("Q. When Bunting arrived late, what impact did that have on the exterior subcontractors as a group? A. Basically, it derailed the plan. The flow wasn't there and created some issues, more coordination on having other stages at a higher elevation . . . You had to make adjustments to be able to work safely.").  Given this, the delay in Bunting's arrival at the Project resulted in Bunting starting its installation work in early July 2018, which was more than a month after the expected start date.  ECF No. 208 at 61:20-23 (testimony of John Maguire stating that Bunting began panel installation in July 2018); *see also* ECF No. 209 at 130:6-133:1 (testimony of Gary Shafer regarding his June 1, 2018, Letter to Bunting, Bunting's failure to follow the Project schedule and Bunting's slow mobilization); Whiting-Turner Ex. 42 (June 1, 2018, Letter from Gary Shafer to Bunting).  And so, the evidence corroborates Whiting-Turner's argument that Bunting's failure to timely mobilize to the Project site was a material breach of Bunting's obligations under the Subcontract.

Bunting's defenses to this material breach of the Subcontract are also unsubstantiated for several reasons.  First, Bunting argues without persuasion that its failure to timely mobilize to the Project site is excused under the prevention doctrine.  The prevention doctrine is a mechanism to excuse the nonperformance of one party when the other fails to perform.  *Parkway 1046, LLC v. U. S. Home Corp.*, 961 F.3d 301, 310 (4th Cir. 2020).  And so, "if one party to a contract 'hinders, prevents or makes impossible performance by the other party, the latter's failure to perform will be excused.'  In other words, the prevention doctrine applies when one party prevents another party from performing under the contract."  *Id*. (quoting *WSC/2005 LLC v. Trio Ventures Assocs.*, 190

---

[8] The April 1, 2018, Project Schedule Analysis and the May 1, 2018, Project Schedule Update provided for slightly different dates for mobilization.  But, there is no dispute that Bunting was required to mobilize to the Project site no later than May 29, 2018.  *See* ECF No. 237-1 at 7 (May 1, 2018, Project Schedule Update); Whiting-Turner Ex. 252 (April 1, 2018, Project Schedule Analysis).

A.3d 255, 267 (2018) (internal citations omitted)); *see also Yacoubou v. Wells Fargo Bank, N.A.*, 901 F. Supp. 2d 623, 629 (D. Md. 2012); *State Dept. of Gen. Servs. v. Cherry Hill Sand & Gravel Co.*, 51 Md. App. 299, 310 (1982).

Bunting argues here that it was prevented from mobilizing to the Project site, because the Project site was not ready for it to begin installing the metal panels in May and June 2018.  ECF No. 220 at 12.  But, Bunting's claim is not substantiated by the evidence.  While there is some evidence before the Court to show that certain areas at the Project site were not available to Bunting to begin the installation of the metal panels in May 2018, primarily due to ongoing predecessor contractor work, the evidence also shows that there were other areas within the Project site where Bunting could have begun installing the metal panels in late May 2018, or early June 2018.  Notably, the evidence shows that Bunting identified several areas where it could have begun the metal panel installation on June 4, 2018.  Whiting-Turner Ex. 43 (June 4, 2018, email from John Maguire to Dave Yedlowski identifying various areas where Bunting could begin its panel installation).

Bunting's claim that Whiting-Turner prevented it from timely starting work in May 2018, due to a lack of access to swing stages, is also refuted by the evidence.  ECF No. 220 at 13.  While the evidence does show that Bunting did not have access to swing stages at the Project site in May 2018, the evidence also shows that Bunting did not have a swing stage plan in place, or a swing stage subcontractor, until June 2018.  ECF No. 209 at 176:1-18 (testimony of Barkin Guner regarding Bunting's procurement of swing stages).  Given this, the evidence shows that Bunting was not prepared to mobilize to the Project site in May 2018, rather than that Whiting-Turner prevented Bunting from timely mobilizing to the Project site due to a lack of access to swing stages, as Bunting suggests.

Bunting's argument that the Missing Stud Issue prevented it from timely mobilizing to the Project site is also unsupported by the evidence.  ECF No. 220 at 13-14.  Bunting argues that its mobilization and installation work were hindered, because the framing subcontractor for the Project had not installed studs, which were needed for Bunting to install its z-girts, by February 2018.  *Id*.; *see* Bunting Ex. 15 (February 24, 2018, Non-Conforming Work Notice 0015 regarding the Missing Stud Issue); ECF No. 207 at 210:16-19, 211:7-11, 220:4-7, 221-3-6 (testimony of John Maguire regarding the notification and effect of the Missing Stud Issue).  This argument finds some support in the evidence.  ECF No. 208 at 163:6-20 (testimony of Cherese Stevens

acknowledging that another subcontractor missed installing studs.).  But, the evidence also shows that Bunting overstates the extent of the impact of the Missing Stud Issue on its ability to timely mobilize to the Project site.

In this regard, Joshua Bunting opines in his expert report that Bunting's metal panel work was impacted and delayed by 328 days, due to the Missing Stud Issue.  Bunting Ex. 355 at 9-11 (Supplemental Expert Disclosure of Joshua P. Bunting's Opinions, explaining delay due to the Missing Stud Issue).  But Mr. Bunting provides no support for this opinion.  *See id*.  Cherese Stevens's sworn testimony also contradicts Mr. Bunting' assessment of the impact of the Missing Stud Issue.  While Ms. Stevens acknowledged that the Missing Stud Issue affected Bunting's ability to install the metal panels, she also testified that other areas of the Project were available for Bunting to install metal panels notwithstanding this the Missing Stud Issue.  ECF No. 208 at 179:12-23 (testimony of Cherese Stevens).  Ms. Stevens also testified that the Missing Stud Issue was resolved in one to two weeks.  *Id.* at 180:1 (testimony of Cherese Stevens).  Given this, the evidence does not substantiate Bunting's claim that the Missing Stud Issue prevented it from mobilizing to the Project site until late June 2018.[9]

Lastly, Bunting's argument that its late mobilization to the Project site is excused, because of Whiting-Turner's prior material breach of the Subcontract, is also unsubstantiated.  ECF No. 220 at 15.  As the Fourth Circuit has held, "a material breach by one party to a contract excuses the other party from performance." *Final Analysis Commc'n Servs., Inc. v. Gen. Dynamics Corp*., 253 F. App'x 307, 313 (4th Cir. 2007) (citing *Rogers Refrigeration Co., Inc. v. Pulliam's Garage, Inc.*, 66 Md. App. 675, 505 A.2d 878, 883 (1986); *see also Lazorcak v. Feuerstein*, 327 A.2d 477, 480 (Md. 1974); *Fromm Sales Co. v. Troy Sunshade Co.*, 222 Md. 229, 159 A.2d 860, 863 (1960)).  And so, if Bunting can show that Whiting-Turner materially breached the Subcontract before it did

---

[9] Bunting's argument that its late mobilization to the Project is not a material breach of the Subcontract, because the Project's schedule includes 68 days of float for the initial start date of its metal panel installation at Level 8, is also unavailing.  ECF No. 220 at 11-12; Whiting-Turner Ex. 252 (April 1, 2018, Project Schedule Analysis).  The evidence shows that Bunting's delay in mobilizing to the Project site not only delayed its installation work, but also interfered with the work of other subcontractors that Bunting needed to coordinate with to complete the metal panel installation using the "cork screw" method.  ECF No. 209 at 178:5-10 (testimony of Barkin Guner) ("Q. When Bunting arrived late, what impact did that have on the exterior subcontractors as a group? A. Basically, it derailed the plan. The flow wasn't there and created some issues, more coordination on having other stages at a higher elevation . . . You had to make adjustments to be able to work safely.").  And so, any float in the Project Schedule would not have substantially absorbed the significant impact of Bunting's failure to timely mobilize to the Project site.

so, Whiting-Turner cannot recover damages for Bunting's subsequent nonperformance. *Jay Dee/Mole J.V. v. Mayor and City Council of Baltimore,* 725 F. Supp. 2d 513, 528 (D. Md. 2010); *Bollech v. Charles County*, 166 F. Supp. 2d 443, 458 (D. Md. 2001) ("Failure of performance by one party suspends the duty of the other party to perform.") (internal citations omitted).

Bunting argues here that Whiting-Turner materially breached the Subcontract in March 2018 by making late changes to the building façade's design. ECF No. 220 at 12 and 20. As a result, Bunting argues that it was delayed in mobilizing to the Project site, it could not start fabrication of the metal panels until April 2018.

Again, there is some evidence before the Court to support Bunting's claim. During the trial, Bunting's Director of Engineering for the Project, Firas Abdelahad, testified that Bunting received additional details from the Project's Architect on March 30, 2018, which added metal flashing materials, metal plate and additional air barrier (or waterproofing) to the Project's design. ECF No. 207 at 95:1-7, 98:5-24, 100:11-101:14, 102:10-16 (testimony of Firas Abdelahad regarding design changes); *see also* Bunting Ex. 25 (March 30, 2018, email from Cherese Stevens to Dave Yedlowski advising Bunting of design changes and requesting modifications to shop drawings). Bunting argues that this value engineering change for the Project, without a revised design by the Architect, required "multiple submissions of shop drawings by the building façade trades, which resulted in a delay to the approval process" and that it could not start its metal panel fabrication until the final design was completed and approved. ECF No. 212 at 17; *see also* Bunting Ex. 22 (March 22, 2018, email from John Alvarado to Barkin Guner explaining that the architectural drawings would not be revised); ECF No. 207 at 104:7-9 (testimony of Firas Abdelahad regarding his non-receipt of an official drawing showing the "window head"); ECF No. 207 at 127:9-13, 130:4-131:12, 134:10-135:6, 136:22-137:1, 137:13-24 (testimony of John Alvarado regarding the impact of value engineering design change).

Joshua Bunting also opines in his expert report that that Bunting's metal panel work was impacted by at least 161 days, due to the design change and shop drawing issue. Bunting Ex. 355 at 15-16 (Supplemental Expert Disclosure of Joshua P. Bunting's Opinions, explaining delay due to the design change and shop drawing issue); *see also* ECF No. 209 at 90:23-24, 91:16 (testimony of Joshua Bunting regarding his expert opinion on how many days of delay were caused by the

design change and shop drawing issue).  But, Mr. Bunting's opinion is offered without any scheduling analysis or evidentiary support.  *See id.*

Given this, the Court must afford limited weight to Mr. Bunting's opinion about the impact of the late design change to the Project.  And so, the evidence before the Court also does not substantiate Bunting's claim that Whiting-Turner materially breached the Subcontract by making a late design change.

For each of the above reasons, the Court **CONCLUDES** that Bunting materially breached the Subcontract in May 2018, by failing to timely mobilize to the Project site.

### 2. Bunting Materially Breached The Subcontract By Failing To Complete Fabrication Of The Metal Panels

The evidence also shows that Bunting materially breached the Subcontract by failing to timely complete the fabrication of the metal panels for the Project within the 18-week period required under the Subcontract.  In this regard, the scope of work for the Subcontract provides that the "duration of fabrication" for the metal panels is "18 weeks after approval of product data/samples/shop drawings."  Joint Ex. 1 at WHITINGTURNER008298 (Subcontract at Ex. B, ¶ 75(b)).  As discussed above, Article 4(a) of the Subcontract also requires that Bunting "agrees to commence, pursue diligently and complete the work in such sequence and order and according to such schedules as [Whiting-Turner] shall establish from time to time during the course of the work, and shall perform the work so as not to delay any other trades or contractors, time being of the essence of this Subcontract."  Joint Ex. 1 at WHITINGTURNER008283 (Subcontract at Art. 4(a)).

Given this contractual language, the Court reads the Subcontract to require that Bunting complete the fabrication of the metal panels no later than 18 weeks after the approval of its product data/samples/shop drawings.  But the evidence makes clear that Bunting did not satisfy this requirement.

In this regard, the unrebutted evidence shows that Whiting-Turner approved Bunting's shop drawings for the metal panels on February 22, 2018, thereby triggering the 18-week period for Bunting to complete the fabrication of the metal panels.  Bunting Ex. 247 at 4 (Bunting Submittal Log noting Submittal No. 074200_005d is "Approved As Corrected"); ECF No. 207 at 94:13-25 (testimony of Firas Abdelahad regarding when Bunting's last submittal was sent to and

approved by Whiting-Turner).  Given this, Bunting was required to complete the fabrication of the metal panels by the end of June 2018, based upon the approval date for the shop drawings.  Joint Ex. 1 at WHITINGTURNER008298 (Subcontract at Ex. B., ¶ 75(b), providing 18-week period after approval of shop drawings for metal panel fabrication).

The evidence also shows that Bunting began fabricating the metal panels in April 2018—several weeks after the approval of the shop drawings.  ECF No. 209 at 186:2-4 (testimony of Barkin Guner stating that Bunting began metal panel fabrication in April 2018).  And so, allowing for Bunting's start date, the 18-week period to fabricate the metal panels would have expired no later than the end of September 2018.  Joint Ex. 1 at WHITINGTURNER008298 (Subcontract at Ex. B., ¶ 75(b), stating 18-week duration for panel fabrication).

The evidence shows, however, that Bunting was still in the process of fabricating the metal panels in January 2019, several months after this deadline.  Whiting-Turner Ex. 103 (spreadsheet showing the results of the January 2019 panel fabrication review by Eric Krahe and Cherese Stevens); ECF No. 210 at 186:2-25 (testimony of Eric Krahe regarding the January 2019 panel fabrication review and determination that 900 panels remained unfabricated).  In this regard, the evidence shows that Whiting-Turner determined that 900 of 3,500 metal panels required for the Project (approximately 25%) had not yet been fabricated in January 2019.  *Id*.  While Bunting appears to dispute the number of metal panels that it had not fabricated by January 2019, there is no dispute that Bunting failed to complete the fabrication of the metal panels within the 18-week timeframe required under the Subcontract.  *See* ECF No. 220 at 6-9.

In fact, the contemporaneous evidence makes clear that Bunting acknowledged that it had not completed the fabrication of the metal panels by June 2018 in its Revised Payment Application No. 15, which shows a 76% completion percentage for the metal panel fabrication as of November 2018.  *Compare* Bunting Ex. 134 (Payment Application No. 15, for the period ending November 30, 2018) *with* Bunting Ex. 207 (Revised Payment Application No. 15, for the period ending November 30, 2018).  The evidence also makes clear that Bunting did not deliver the final set of the metal panels to the Project site until April 2019, approximately 10 months after the deadline for completing fabrication.  Bunting Ex. 242 (April 16, 2019, email from Eric Krahe to Dave Yedlowski regarding receipt of metal panel shipment); ECF No. 209 at 71:20-72:2, 76:20-24

(testimony of Joshua Bunting regarding the existence and delivery of the remaining 459 metal panels).

Given this evidence, the Court **CONCLUDES** that Bunting breached the Subcontract by failing to timely complete the fabrication of the metal panels for the Project. The Court also concludes that this breach was a material breach of the Subcontract, because the evidence shows that Bunting's delay in fabricating the metal panels impacted and delayed the work on the Project. ECF No. 210 at 191:21-24 (testimony of Eric Krahe stating that the delay in fabrication "affect[ed] the ability to ensure that [Whiting-Turner had] exterior trades moving forward, or when [Whiting-Turner] coordinate[d] to have particular work areas free and clear for this work to be installed, it kind of [threw] a wrench in the whole plan."); *see also id.* at 191:14-193:16 (same); ECF No. 211 at 90:24-25 (testimony of Laura Murphy stating that Whiting-Turner made it clear that the panel delivery was "pretty critical.").

Bunting's defenses regarding its material breach of the Subcontract in this regard are also unavailing. Bunting first argues that it cannot be liable for this material breach of the Subcontract, because Whiting-Turner prevented Bunting from timely completing the fabrication of the metal panels, by making late design changes to the building façade. ECF No. 220 at 13. As discussed above, a party's failure to perform under a contract will be excused if the other party hinders, prevents or makes impossible performance by that party. *Parkway 1046, LLC v. U. S. Home Corp.*, 961 F.3d 301, 310 (4th Cir. 2020). As also discussed above, there is some evidence before the Court to support Bunting's claim that Whiting-Turner's late design changes impacted Bunting's work. *See* ECF No. 207 at 95:1-7, 98:5-24, 100:11-101:14, 102:10-16 (testimony of Firas Abdelahad); Bunting Ex. 22 (March 22, 2018, email from John Alvarado to Barkin Guner explaining that the architectural drawings would not be revised); Bunting Ex. 23 (March 28, 2018, email from John Alvarado to Barkin Guner regarding modifications to metal panel details); Bunting Ex. 25 (March 30, 2018, email from Cherese Stevens to Dave Yedlowski advising Bunting of design changes and requesting modifications to shop drawings.); Bunting Ex. 355 at 15-16 (Supplemental Expert Disclosure of Joshua P. Bunting's Opinions, explaining that delays due to the design change and shop drawing issue impacted Bunting's work by at least 161 days); *see also* ECF No. 209 at 90:23-24, 91:16 (testimony of Joshua Bunting regarding his expert opinion on how many days of delay were caused by the design change and shop drawing issue).

But, the unrebutted evidence also shows that Bunting received the details regarding the building design changes on March 30, 2018, and then commenced the fabrication of the metal panels in April 2018. *See* Bunting Ex. 25 (March 30, 2018, email from Cherese Stevens to Dave Yedlowski advising Bunting of design changes and requesting modifications to shop drawings). Nonetheless, Bunting did not complete the fabrication of the metal panels within 18 weeks of receiving these details. Whiting-Turner Ex. 103 (spreadsheet showing the results of the January 2019 panel fabrication review by Eric Krahe and Cherese Stevens); ECF No. 210 at 186:2-25 (testimony of Eric Krahe regarding the January 2019 panel fabrication review and determination that 900 panels remained unfabricated); Bunting Ex. 134 (Payment Application No. 15, for the period ending November 30, 2018); Bunting Ex. 207 (Revised Payment Application No. 15, for the period ending November 30, 2018); Bunting Ex. 242 (April 16, 2019, email from Eric Krahe to Dave Yedlowski regarding receipt of metal panel shipment); ECF No. 209 at 71:20-72:2, 76:20-24 (testimony of Joshua Bunting regarding the existence and delivery of the remaining 459 metal panels).

And so, the evidence does not support Bunting's claim that Whiting-Turner's late design change prevented it from completing the fabrication of the metal panels within the 18-week period required under the Subcontract. For these same reasons, Bunting's argument that Whiting-Turner materially breached the Subcontract by providing the late design change, thereby excusing its own material breach of the subcontract, is equally unavailing.

Bunting's argument that it was unable to complete the fabrication of the metal panels, because it could not take the field measurements needed to fabricate the retail level panels, is also unsubstantiated. ECF No. 220 at 6-9; ECF No. 236-1 at 2; *see also* ECF No. 209 at 35:13-36:17 (testimony of Joshua Bunting regarding field measurements for retail level panels); Joint Ex. 6 at WHITINGTURNER022059 (Project Specification 07 42 00 at Part 3.1(A)(1)); ECF No. 209 at 50:3-51:2 (testimony of Joshua Bunting regarding his understanding of Part 3.1(A)(1) of Project Specification 07 42 00). The evidence shows that field measurements were not necessary for Bunting to complete the fabrication of the metal panels for the retail levels of the Project building. ECF No. 209 at 226:18-227:14 (testimony of Barkin Guner regarding applicability of Part 3.1(A)(1) to Bunting's work). Bunting also fails to explain how the lack of field measurements for the metal panels for the retail level of the Project building would have prevented it from fabricating the other metal panels required under the Subcontract. *See id.* And so, Bunting simply

has not shown that the inability to access the Project site and to take field measurements prevented Bunting from completing the fabrication of the metal panels.[10]

Because the evidence shows that Bunting failed to complete the fabrication of the metal panels within the timeframe required under the Subcontract, the Court also CONCLUDES that Bunting materially breached the Subcontract in September 2018.

### 3.  Bunting Materially Breached The Subcontract By Failing To Make Progress On The Installation Of The Metal Panels

The evidence similarly shows that Bunting materially breached the Subcontract by failing to make progress on the installation of the metal panels.  In this regard, Article 4(a) of the Subcontract requires that Bunting complete its installation work pursuant to the Baseline Project Schedule as updated or modified by Whiting-Turner.  Joint. Ex. 1 at WHITINGTURNER008283 (Subcontract at Art. 4(a)).  Pursuant to the March 1, 2018, Project Schedule Update, Bunting was required to: (1) start installing its metal panels on Level 8; (2) complete its work on Level 8; and (3) then proceed to the level immediately above until finishing at the penthouse level.  Bunting Ex. 16 (March 1, 2018, Project Schedule Update).  The exact timing of Bunting's work was, however, modified during the course of the Project.

In this regard, the April 1, 2018, Project Schedule Analysis prepared by Whiting-Turner's construction scheduling expert, Paul Brough, shows a May 29, 2018, commencement date and an October 26, 2018, completion date for the installation of the metal panels.  Whiting-Turner Ex. 252 at Ex. A (April 1, 2018, Project Schedule Analysis).  The May 1, 2018, Project Schedule Update

---

[10] Bunting's claim that that Dimensional Bust Issue prevented it from timely fabricating the metal panels lacks evidentiary support.  ECF No. 212 at 19-20.  Bunting maintains that Whiting-Turner installed the east-west control line for the Project building one inch off at both the east and west elevations and that this error prevented it from installing its metal panels in the "cork screw" manner and impacted its overall metal panel work.  ECF No. 208 at 32:10- 33:2, 33:23-25 (testimony of John Maguire regarding the effect of the Dimensional Bust Issue).  But Bunting has not shown how this issue impacted the fabrication of the metal panels.  Nor has Bunting shown that the delay in receiving direction from Whiting-Turner about the location of the perforated metal screens, prevented it from completing the fabrication of the metal panels within the time period required under the Subcontract.  ECF No. 209 at 28:16-29:9 (testimony of Joshua Bunting regarding August 20, 2018, email from Barkin Guner); Bunting Ex. 355 at 5-7 (Supplemental Expert Disclosure of Joshua P. Bunting's Opinions, explaining delay due to Dimensional Bust Issue); ECF No. 209 at 88:14-89:5 (testimony of Joshua Bunting regarding his expert opinion on how many days of delay were caused by the Dimensional Bust Issue).  For the same reasons, Bunting's claim that Whiting-Turner materially breached the Subcontract by failing to rectify the Dimensional Bust Issue is unsubstantiated by the evidence.

shows a May 15, 2018, commencement date and a October 25, 2018, completion date for the installation of the metal panels.  ECF No. 237-1 at 1, 16-17 (May 1, 2018, Project Schedule Update).

The Baseline Project Schedule and Project Schedule Updates also provide that, once Bunting completed its metal panel work on Levels 8 through 25, Bunting would then mobilize to the ground level retail areas of the building to complete its louver and grille work and install the remaining metal panels at the ground level.  Joint Ex. 1 at WHITINGTURNER008327 (Baseline Project Schedule); Bunting Ex. 16 (March 1, 2018, Project Schedule Update); Whiting-Turner Ex. 252 (April 1, 2018, Project Schedule Analysis); Bunting Ex. 80 at 5 (September 7, 2018, Project Schedule Update); ECF No. 210 at 213:16-25 (testimony of Eric Krahe regarding the sequence of Bunting's work).  And so, the evidence shows that Bunting was expected to complete the installation of the metal panels by October 2018.

The evidence shows, however, that Bunting was not making much progress in installing the metal panels for the Project by August 2018.  In this regard, Gary Shafer testified during the trial that Bunting's "slow" installation was due to "a lot of material issues, both procurement or getting the material, making it, and then shipping it to the site.  ECF No. 208 at 132:11-17 (testimony of Gary Shafer).  The evidence also shows that Bunting experienced manpower issues that delayed its installation work.  *Id.* at 132:20-133:1 (testimony of Gary Shafer regarding communication with Bunting about the need to increase the manpower, and Bunting not doing so); *see also* ECF No. 210 at 78:16-80:14 (testimony of Brian Kent regarding Bunting not following "cork screw" method and general inefficiency in Bunting's work).  Whiting-Turner's construction management expert, Brian Kent, also opined that Bunting's work was negatively impacted by, in part, the inefficient fabrication and delivery of the materials.  Whiting-Turner Ex. 251 at 3; *see also* ECF No. 210 at 78:16-80:14 (testimony of Brian Kent regarding Bunting not following "cork screw" method and general inefficiency in Bunting's work); Whiting-Turner Ex. 57 (April 22, 2018, email from John Maguire to Dave Yedlowski stating that Bunting "couldn't find panels").

Whiting-Turner's scheduling expert, Paul Brough also testified that Bunting was significantly behind schedule for the installation of the metal panels by September 12, 2018.  ECF No. 210 at 133:9-11 (testimony of Paul Brough).  Notably, Mr. Brough's expert report shows that Bunting had completed only 13% of the metal panel installation by mid-August 2018.  Whiting-

Turner Ex. 252 at 7 and Ex. B. (Expert Report of Paul Brough); *see also* ECF No. 210 at 133:9-139:25 (testimony of Paul Brough regarding Bunting's installation progress).  Mr. Brough also testified that Bunting's installation work continued to be significantly behind the Project Schedule between September 12, 2018, and January 15, 2019.  ECF No. 210 at 140:1-141:18 (testimony of Paul Brough regarding Bunting's progress between September 12, 2018, and January 15, 2019).

The contemporaneous evidence also makes clear that Bunting knew it was behind schedule.  In fact, Bunting acknowledges in its Payment Application 13, for the period ending Sept. 30, 2018, that only 25% of the metal panels had been installed by that time.  Whiting-Turner Ex. 212 at 2 (Payment Application No. 13, for period ending September 30, 2018, at Line 19).  Bunting's subsequent Payment Application No. 15, for the period ending Nov. 30, 2018, similarly acknowledges that just 35% of the metal panels had been installed by November 2018.  Whiting-Turner Ex. 214 at 2 (Payment Application No. 14, for period ending October 31, 2018, at Line 19).

The evidence also shows that, in December 2018, Whiting-Turner pressed Bunting to provide a recovery plan to address the metal panel installation delay.  Whiting-Turner Ex. 82 (December 6, 2018, Letter from Barkin Guner to Dave Yedlowski noting the need for a remedial plan by December 8, 2018); *see also* Whiting-Turner Ex. 84 (December 20, 2018, email from Gary Shafer to Bryan Slotten) ("WT will require a remedial schedule to correct your failing schedule by Thursday Dec. 20th, 2018.").  But a recovery plan was never provided by Bunting.  Whiting-Turner Ex. 86 (January 7, 2019, Letter from Gary Shafer to Dave Yedlowski stating that Whiting-Turner had not received a recovery plan from Bunting as of that date).  ECF No. 208 at 139:10-20 (testimony of Gary Shafer explaining that Bunting never sent the contractually required recovery schedule).  Rather, a January 2019 review of the percentage of metal panels installed by Bunting shows that just 23% of the panels had been installed by that time.  Whiting Turner Ex. 104 (spreadsheet tracking panel installation as of January 2019 by square footage); ECF No. 210 at 186:14-16, 187:16-22 (testimony of Eric Krahe regarding 23% installation progress in January 2019).  Thereafter, it is undisputed that Bunting withdrew its workforce when the metal panel installation was incomplete. [11]

---

[11] On January 15, 2019, Whiting-Turner informed Bunting that it would supplement Bunting's workforce. Whiting-Turner Ex. 89 (January 15, 2019, Letter from Dan Ramsey to Joshua Bunting regarding supplementation of Bunting's work).  Bunting contends that it laid off its workforce in February 2019, based upon an agreement that Bunting reached with Whiting-Turner, pursuant to which Bunting would

Given this evidence, which is largely undisputed, the Court **CONCLUDES** that Bunting breached the Subcontract by failing to make progress on, and failing to complete, the installation of the metal panels for the Project. The Court also **CONCLUDES** that Bunting's breach is material, because the evidence shows that the failure to make progress on installing the metal panels as required by the Subcontract delayed the completion of the exterior of the Project building. ECF No. 210 at 191:21-24 (testimony of Eric Krahe regarding the impact of Bunting's delay and breach).

For many of the same reasons discussed above, Bunting's defenses to this material breach of the Subcontract are not persuasive. Notably, Bunting has not shown that the delays that it experienced with setting up its swing stages in June 2018 prevented it from making more progress on the installation of the metal panels. ECF No. 220 at 13; ECF No. 209 at 176:1-18 (testimony of Barkin Guner regarding Bunting's procurement of swing stages).

Bunting's argument that problems with the waterproofing for the Project building delayed its work does find more evidentiary support. During the trial, several witnesses testified that there were problems with waterproofing at the Project site. ECF No. 207 at 158:3-7, 158:15-17, 159:2-160:4, 161:14-162:6 (testimony of John Alvarado regarding ongoing discussions at building façade coordination meetings regarding how the value engineering of the building façade would be implemented, as well as concerns regarding water leaks and watertightness of the building); ECF No. 207 at 201:4-22, ECF No. 208 at 11:5-8 12:5-24, 15:12-16:15 (testimony of John Maguire regarding deficiencies in waterproofing and the impact on Bunting's work throughout the Project); ECF No. 208 at 250:10-251:17, 252:4-24, 254:3-18 (testimony of Joshua Bunting regarding deficiencies in waterproofing and the impact on Bunting's work throughout the Project). But Mr. Bunting's expert opinion that Bunting's metal panel installation work was impacted by 424 days due to these waterproofing issues lacks evidentiary support. Bunting Ex. 355 at 12-15

---

supply the remaining materials for the Project and give Whiting-Turner access to Bunting's swing stages, and, in turn, Whiting-Turner would be responsible for the installation of those materials. ECF No. 211 at 122:2-25 (testimony of Joshua Bunting regarding the formation and terms of the agreement). Bunting contends that Joshua Bunting and Daniel Ramsey made this agreement. *Id*. at 122:21-25. But, Whiting-Turner disputes that the parties reached such an agreement and it is undisputed that there is no written agreement to this effect. ECF No. 213 at 27.

(Supplemental Expert Disclosure of Joshua P. Bunting's Opinions regarding delay due to the waterproofing issues).

While the Court agrees that Bunting's work was delayed by the waterproofing issues, there is no evidence before the Court to explain why these waterproofing concerns prevented Bunting from making more meaningful progress on installing the metal panels by September 2018 and by January 2019. Given this, Bunting's argument that Whiting-Turner prevented it from making progress on installing the metal panels does not find support in the evidence.

For this same reason, Bunting's assertion that Whiting-Turner materially breached the Subcontract, by preventing Bunting from making progress on installation due to the waterproofing issues, is also unsubstantiated. And so, the Court **CONCLUDES** that Bunting also materially breached the Subcontract by failing to make progress on, and failing to complete, the installation of the metal panels.[12]

In sum, the evidence before the Court shows that Bunting materially breached the Subcontract, by: (1) failing to timely mobilize to the Project site in May 2018; (2) failing to complete the fabrication of the metal panels by September 2018; and (3) failing to make progress in installing the metal panels by September 2018 and by January 2019, and that Whiting-Turner did not materially breach the Subcontract prior to the dates of these material breaches. Given this, the Court **CONCLUDES** that Bunting is liable to Whiting-Turner for these material breaches of

---

[12] Bunting's defense that Whiting-Turner waived any breach that occurred during or after September 2018, because it continued to accept performance from Bunting after issuing the September 2018 Default Notice, is also contradicted by the evidence. Article 7(d) of the Subcontract provides that "in the event Contractor does not terminate, but assents to delayed completion of the work…such assent shall not be construed as a waiver of the Subcontractor's obligation to reimburse the Contractor for any costs, damages or expenses incurred as a result of such delay[.]" Joint Ex. 1 at WHITINGTURNER008286 (Subcontract at Art. 7(d), titled "Default"). In addition, September 2018 Default Notice provides that: "[i]n the event the Contractor does not terminate this Subcontract, but assents to delayed completion of the work by the Subcontractor, such assent shall not be construed as a waiver of the Subcontractor's obligation to reimburse the Contractor for any costs, damages, or expenses incurred as a result of such delay; and all such costs, damages, and expenses shall be paid or reimbursed to Contractor upon demand per Article 7.d." Whiting-Turner Ex. 65 (September 2018 Default Notice). And so, there is no evidence from which the Court can draw an inference that Whiting-Turner intended to waive its right to seek damages or terminate the Subcontract based upon the grounds of Bunting's default.

the Subcontract.[13]  And so, the Court next considers whether Travelers is also liable to Whiting-Turner for Bunting's breaches.

### C.  Travelers Is Liable For Bunting's Breaches

Because the evidence shows that Bunting materially breached the Subcontract by failing to: (1) timely mobilize to the Project site; (2) complete the fabrication of the metal panels; and (3) to make progress in installing these panels, the Court must also **CONCLUDE** that Travelers is liable to Whiting-Turner for these material breaches under the terms of the Subcontract and the Performance Bond.  As the Appellate Court of Maryland has explained:

> A surety bond is a contract and is to be construed as such.  The bond must be construed in accordance with traditional rules of objective contract interpretation, meaning the clear and unambiguous language of the bond is controlling. It follows that the liability of a surety is not to be extended, by implication, beyond the terms of [its] contract. Where the contract incorporates as a part of itself the specifications, and the contract is, by reference, incorporated as a part of the bond, the contract, the specifications, and the bond must all be construed together.

*Wildewood Operating Co. v. WRV Holdings,* 259 Md. App. 464, 303 A.3d 1273 (Md. App. 2023) (internal citations omitted); *see also, Inst. of Mission Helpers of Baltimore City v. Reliance Ins. Co.,* 812 F. Supp. 72, 74 (D. Md. 1992) (holding that "[t]he traditional rules of contract interpretation determine the liability of surety.").  In this case, Bunting and Travelers executed the Performance Bond, which guarantees Bunting's performance under the Subcontract.  Joint Ex. 4 at 1 (Performance Bond). And so, the Performance Bond governs Travelers liability in this case.

In this regard, the Performance Bond provides that:

> WHEREAS, [Bunting] has by written agreement dated January 7, 2017 entered into Contract No. 015270-05C with [Whiting-Turner] for construction and installation of Thermoplastic Core Pa Perforated metal panels, Architectural Louvers in accordance with

---

[13] Because the Court finds that Bunting materially breached the Subcontract in May and September 2018, the Court need not address whether Bunting also breached the Subcontract by failing to submit shop drawings for certain architectural louvers and metal panels or failing to complete other Subcontract deliverables.  For similar reasons, the Court does not need to address whether Whiting-Turner materially breached the Subcontract by: (1) wrongfully terminating the Subcontract; (2) wrongfully issuing Default Notices to Bunting for its work on that Project; (3) wrongfully supplementing Bunting's work; or (4) failing to pay Bunting for its work, to resolve the issue of liability.

> the drawings and specifications prepared by [Whiting-Turner] which Contract is made a part hereof, and hereinafter referred as a Contract.

Joint Ex. 4 at 1 (Performance Bond).   The Performance Bond also provides that:

> [Bunting and Travelers] are held and firmly bound unto [Whiting-Turner] in the amount of [$2,652,500.00] for the payment whereof [Bunting] and [Travelers] bind themselves, their heirs, executors, administrators, successors, and assigns, jointly and severally, firmly by these presents[.]

*Id*.  Lastly, relevant to Travelers' obligations if Bunting breaches the Subcontract, the Performance Bond also provides that:

> Whenever [Bunting] shall be declared by [Whiting-Turner] to be in default under the Contract, [Travelers] shall, withing ten (10) calendar days after notice of default from [Whiting-Turner] notify [Whiting-Turner] of its election either to promptly proceed to remedy the default or promptly proceed to complete the [C]ontract in accordance with and subject to its conditions. *In the event that [Travelers] does not elect to exercise either of the above stated options, the [Whiting-Turner] thereupon shall have the remaining work completed, [Travelers] to remain liable hereunder for all expenses, including attorney's fees, of completion.*

*Id.* at 2 (emphasis supplied).

There is no dispute in this case that Whiting-Turner issued notices of default regarding the Subcontract to Bunting on September 12, 2018, and on March 5, 2019.  Whiting-Turner Ex. 65 (September 2018 Default Notice); Bunting Ex. 208 (March 2019 Default Notice).  It is also undisputed that Travelers did not elect to either "promptly proceed to remedy the default or promptly proceed to complete the [C]ontract in accordance with and subject to its conditions" and that Whiting-Turner arranged to have the remaining work completed by another subcontractor. Whiting-Turner Ex. 89 (January 2019 Supplementation Letter).

Given this, the evidence and terms of the Performance Bond make clear that Travelers is liable to Whiting-Turner for "all expenses, including attorney's fees, of completion" under the terms of the Performance Bond, subject to the limit of the Performance Bond.  And so, the Court **CONCLUDES** as a final matter that Travelers is liable to Whiting Turner for Bunting's breached, subject to the $2,652,500.00 limit set forth in the Performance Bond.

## V.    CONCLUSION

In sum, the evidence before the Court shows that Bunting materially breached the Subcontract, by: (1) failing to timely mobilize to the Project site in May 2018; (2) failing to complete the fabrication of the metal panels in September 2018; and (3) failing to make progress on, and to complete, the installation of the metal panels by September 2018 and by January 2019, and that Whiting-Turner did not materially breach the Subcontract prior to these breaches.  The evidence before the Court also shows that, as the surety under the Performance Bond, Travelers' is liable to Whiting-Turner in an amount of up to $2,652,500.00, for Bunting's material breaches of the Subcontract.

And so, the Court **CONCLUDES** that:

1. Bunting materially breached the Subcontract, by: (a) failing to timely mobilize to the Project site in May 2018; (b) failing to complete the fabrication of the metal panels in September 2018; and (c) failing to make progress on, and to complete, the installation of the metal panels by September 2018 and by January 2019;

2. Whiting-Turner did not materially breach the Subcontract prior to Bunting's material breaches;

3. Bunting is **LIABLE** to Whiting-Turner for its material breaches of the Subcontract; and

4. Travelers is also **LIABLE** to Whiting-Turner for Bunting's material breaches of the Subcontract, up to the amount of **$2,652,500.00**.

A separate Order shall issue.

**IT IS SO ORDERED.**

s/ Lydia Kay Griggsby
LYDIA KAY GRIGGSBY
United States District Judge